1    IAN N. FEINBERG (SBN 88324)
     ifeinberg@feinday.com
2    M. ELIZABETH DAY (SBN 177125)
     eday@feinday.com
3    MARC BELLOLI (SBN 244290)
     mbelloli@feinday.com
4    NICHOLAS MARTINI (SBN 237687)
     nmartini@feinday.com
5    **FEINBERG DAY KRAMER ALBERTI LIM**
     **TONKOVICH & BELLOLI LLP**
6    577 Airport Blvd., Suite 250
     Burlingame, CA. 94010
7    Tel: 650.825.4300/Fax: 650.460.8443

8    *Attorneys for Plaintiff* BioCardia Lifesciences, Inc.

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12   BIOCARDIA LIFESCIENCES, INC.          CASE NO.  3:20-cv-07510

13                    Plaintiff,            **COMPLAINT**

14                    v.                    **JURY TRIAL DEMANDED**

15   SURBHI SARNA, nVISION MEDICAL
     CORPORATION, BOSTON  SCIENTIFIC
16   CORPORATION, BOSTON SCIENTIFIC
     SCIMED, INC., FORTIS ADVISORS LCC,
17   ARBORETUM VENTURES IV, LP, ASTIA
     ANGEL nVISION LLC, CATALYST HEALTH
18   VENTURES (PF), L.P., CATALYST HEALTH
     VENTURES FOLLOW-ON FUND, L.P.,
19   CATALYST HEALTH VENTURES III, L.P.,
     CATALYST HEALTH VENTURES, LP, CHV
20   INVESTMENTS, LLC, CHV PARTNERS
     FUND III, L.P., CHV-E PARTNERS III, L.P.,
21   DRAPER ASSOCIATES INVESTMENTS, LLC,
     DRAPER ASSOCIATES RISKMASTER FUND
22   II, LLC, DRAPER ASSOCIATES
     RISKMASTERS FUND III, LLC,
23   EXCELESTAR VENTURES I, LLC,
     EXXCLAIM CAPITAL PARTNERS I, LP,
24   FOGARTY INSTITUTE FOR INNOVATION,
     GOLDEN SEEDS nVISION MEDICAL, LLC,
25   LIFE SCIENCES ANGEL INVESTORS VIII,
     L.L.C., LMNVC, LLC, AND SERAPH
26   nVISION, LLC,

27                    Defendants.

28

Plaintiff BioCardia Lifesciences, Inc. ("BioCardia Lifesciences") alleges claims against defendants Surbhi Sarna ("Ms. Sarna"),  nVision Medical Corporation ("nVision"), Boston Scientific Corporation ("Boston Scientific"), Boston  Scientific Scimed, Inc. ("Boston Scimed"), Fortis Advisors LLC ("Fortis"), Arboretum Ventures IV, LP , Astia Angel nVision LLC, Catalyst Health Ventures (PF), L.P., Catalyst Health Ventures Follow-On Fund, L.P., Catalyst Health Ventures III, L.P.,  Catalyst Health Ventures, LP, CHV Investments, LLC, CHV Partners Fund III, L.P., CHV-E Partners III, L.P., Draper Associates Investments, LLC, Draper Associates Riskmaster Fund II, LLC, Draper Associates Riskmaster Fund III, LLC, Excelestar Ventures I, LLC, EXXclaim Capital Partners I, LP, Fogarty Institute for Innovation, Golden Seeds nVision Medical, LLC, Life Sciences Angel Investors VIII, L.L.C., LMNVC, LLC and Seraph nVision, LLC (including nVision collectively "Defendants"; excluding nVision collectively the "Shareholder Defendants") seeking correction of inventorship, damages, including damages for Defendant's misappropriation of trade secrets and Ms. Surbhi Sarna's breach of contract, and disgorgement of the Shareholder Defendants' unjust enrichment.

## PARTIES

1.       BioCardia Lifesciences is a corporation organized and existing under the laws of Delaware with its principal place of business at 125 Shoreway Road, Suite B, San Carlos CA 94070.  BioCardia Lifesciences is a wholly owned subsidiary of BioCardia, Inc., a corporation organized under the laws of the State of Delaware with the same principal place of business as BioCardia Lifesceinces.  Prior to an August 22, 2016 transaction in which a company, Tiger X Medical, Inc., acquired all of the stock in what is now BioCardia Lifesciences and changed its name to "BioCardia, Inc.," BioCardia Lifescienses itself was named "BioCardia, Inc."

2.       BioCardia Lifesciences is informed and believes and on that basis alleges that defendant Surbhi Sarna is an individual residing at 249 Randall Street, San Francisco, CA 94131, within this District.

3.       BioCardia Lifesciences is informed and believes and on that basis alleges that defendant Boston Scientific is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 300 Boston Scientific Way, Marlborough, MA

1

01752-l 234 and that Boston Scientific acquired all of the stock in nVision through a reverse triangular merger with a wholly-owned subsidiary Boston Scientific created for that purpose, Boston Scientific Clarity Merger Corp, that was completed on April 13, 2018, whereupon Boston Scientific Clarity Merger Corp. changed its name to nVision .

4.　BioCardia Lifesciences is informed and believes and on that basis alleges that defendant Boston Scientific Scimed, Inc. is (a) a corporation organized and existing under the law of the state of Minnesota with its principle place of business at One SciMed Place, Maple Grove, Minnesota 55311; (b) a wholly-owned subsidiary of Boston Scientific; and (c) is the current assignee of record for all patents that were previously held by nVision Medical Corporation for which it paid no consideration.

5.　BioCardia Lifesciences is informed and believes and on that basis alleges that defendant Fortis Advisors LLC is a Delaware limited liability company with its principal place of business in San Diego, California, and is sued in its capacity as the Stockholders' Representative for the Former Stockholders of nVision Medical Corporation based on its repeated allegations in the complaint it filed against BioCardia, Inc. that it has "a recognized interest" "that is adverse to BioCardia's allegations." See Dkt. No. 1 in Case No. 3:19-05645-VC at ¶¶ 14, 76, 78, 90, 92, 101, 103, 111, 113, 119, 121, 127, 128, 129, 137, 145, 152, 154. To the extent this Complaint alleges acts committed by Fortis, those allegations refer to acts of the Stockholders for whom Fortis is the Stockholder Representative. As further alleged herein, Fortis is required to disgorge to BioCardia the amount it holds in trust for the Shareholder Defendants as a result of the acts of the Stockholders for whom Fortis is the Stockholder Representative.

6.　BioCardia Lifesciences is informed and believes and on that basis alleges that Defendant nVision is a Delaware corporation with its principal place of business at 1192 Cherry Avenue, San Bruno, CA 94066, within this District, and is a wholly-owned subsidiary of Boston Scientific, a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 300 Boston Scientific Way, Marlborough, MA 01752-l 234 which acquired nVision, including all of its intellectual property, through a Merger on April 13, 2018.

7.　BioCardia Lifesciences is informed and believes and on that basis alleges that

-2-

1   defendant Arboretum Ventures IV, LP  is a Michigan Limited Partnership with a place of

2   business at 303 Detroit St, Ste 301, Ann Abor, MI 48104 whose agent for service is The

3   Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801

4   and is a former shareholder of nVision whose shares were acquired by Boston Scientific, 90% of

5   the initial consideration for which was paid in cash and 10% held in escrow, and additional

6   consideration for which shares is subject to an earn-out based on nVision's performance.

7   Arboretum Ventures IV, LP formed in 2015 and has approximately $203.2 million in assets.

8   Their minimum amount of investment is $250,000.  In 2019, Arboretum Ventures raised $252

9   million for its fifth fund.

10          8.      BioCardia Lifesciences is informed and believes and on that basis alleges that

11   defendant Astia Angel nVision LLC ("Astia") is a Delaware Limited Liability Company with a

12   place of business at One Market Plaza, Spear Tower 24th Floor San Francisco, CA 94105, whose

13   agent for service is Harvard Business Services, Inc. 16192 Coastal Hwy Lewes, DE 19958, and is

14   a former shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the

15   initial consideration for which was paid in cash and 10% held in escrow, and additional

16   consideration for which shares is subject to an earn-out based on nVision's performance.

17   BioCardia Lifesciences is informed and believes and on that basis alleges that Anula Jayasuriya

18   served on the Board of Trustees of Astia.  On or around December 4, 2010, while Ms. Sarna was

19   still working at BioCardia, Ms. Jayasuriya reached out to Ms. Sarna via her BioCardia email

20   address and introduced Ms. Sarna to Linda Greub.  Ms. Sarna then followed up with Ms. Greub to

21   request assistance in conceptualizing a catheter system that was the invention of a provisional

22   patent application Ms. Sarna filed while still working at BioCardia.  BioCardia Lifesciences is

23   informed and believes and on that basis alleges that Ms. Jayasuriya knew that BioCardia was a

24   medical device company specializing in catheters.  BioCardia Lifesciences is informed and

25   believes and on that basis alleges that Astia, through its affiliation with Ms. Jayasuriya, were

26   conscious wrongdoers because they acted with the knowledge or despite the known risk that the

27   intellectual property that formed the basis of nVision Medical Corporation had been

28   misappropriated by Ms. Sarna.  Founded in 1999, Astia Angel nVision LLC has made over fifty

-3-

1    (50) investments.

2           9.     BioCardia Lifesciences is informed and believes and on that basis alleges that

3    defendant Catalyst Health Ventures (PF), L.P. is a Massachusetts Limited Partnership with a

4    place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent

5    for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St.

6    Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by

7    Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in

8    escrow, and additional consideration for which shares is subject to an earn-out based on nVision's

9    performance.  Catalyst Health Ventures received $60.5 million for their fourth fund and has over

10   $100 million in capital.

11          10.    BioCardia Lifesciences is informed and believes and on that basis alleges that

12   defendant Catalyst Health Ventures Follow-On Fund, L.P. is a Massachusetts Limited Partnership

13   with a place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose

14   agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St.

15   Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by

16   Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in

17   escrow, and additional consideration for which shares is subject to an earn-out based on nVision's

18   performance.

19          11.    BioCardia Lifesciences is informed and believes and on that basis alleges that

20   defendant Catalyst Health Ventures III, L.P. is a Massachusetts Limited Partnership with a place

21   of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for

22   service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St.

23   Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by

24   Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in

25   escrow, and additional consideration for which shares is subject to an earn-out based on nVision's

26   performance.

27          12.    BioCardia Lifesciences is informed and believes and on that basis alleges that

28   defendant Catalyst Health Ventures, LP is a Massachusetts Limited Partnership with a place of

-4-

business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St. Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

13.     BioCardia Lifesciences is informed and believes and on that basis alleges that defendant CHV Investments, LLC is a Massachusetts Limited Liability Company with a place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St. Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

14.     BioCardia Lifesciences is informed and believes and on that basis alleges that defendant CHV Partners Fund III, L.P. is a Massachusetts Limited Partnership with a place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St. Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

15.     BioCardia Lifesciences is informed and believes and on that basis alleges that defendant CHV-E Partners III, L.P. is a Massachusetts Limited Partnership with a place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St. Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and

1    additional consideration for which shares is subject to an earn-out based on nVision's

2    performance.

3            16.     BioCardia Lifesciences is informed and believes and on that basis alleges that

4    defendant Draper Associates Investments, LLC is a California Limited Liability Company with a

5    place of business at 55 East Third Avenue, San Mateo, CA 94401, whose agent for service is

6    Timothy Cook Draper, 55 East Third Avenue, San Mateo, CA 94401, and is a former shareholder

7    of nVision whose shares were acquired by Boston Scientific, 90% of the initial consideration for

8    which was paid in cash and 10% held in escrow, and additional consideration for which shares is

9    subject to an earn-out based on nVision's performance.  In 2016, Draper Associates raised a $190

10   million fund to invest in technology companies.  Draper Associates Investments, LLC is one of

11   many investment vehicles affiliated with Tim Draper, one of the most successful and

12   sophisticated venture capitalist investors in the world.  Mr. Draper has over 35 years of

13   experience in investment banking and is known for making several highly successful investments

14   in technological companies like Baidu, Hotmail, Skype, Tesla, SpaceX, AngelList, Solarcity,

15   Ring, Twitter, DocuSign, Coinbase, Robinhood, Ancestry.com, Twitch, Cruise Automation, and

16   Focus Media, among others.

17           17.     BioCardia Lifesciences is informed and believes and on that basis alleges that

18   defendant Draper Associates Riskmaster Fund II, LLC is a California Limited Liability Company

19   with a place of business at 55 East Third Avenue, San Mateo, CA 94401, whose agent for service

20   is Timothy Cook Draper, 55 East Third Avenue, San Mateo, CA 94401, and is a former

21   shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the initial

22   consideration for which was paid in cash and 10% held in escrow, and additional consideration

23   for which shares is subject to an earn-out based on nVision's performance.

24           18.     BioCardia Lifesciences is informed and believes and on that basis alleges that

25   defendant Draper Associates Riskmasters Fund III, LLC is a California Limited Liability

26   Company with a place of business at 55 East Third Avenue, San Mateo, CA 94401, whose agent

27   for service is Timothy Cook Draper, 55 East Third Avenue, San Mateo, CA 94401, and is a

28   former shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the

-6-

1    initial consideration for which was paid in cash and 10% held in escrow, and additional

2    consideration for which shares is subject to an earn-out based on nVision's performance.

3          19.    BioCardia Lifesciences is informed and believes and on that basis alleges that

4    defendant Excelestar Ventures I, LLC is a Massachusetts Limited Liability Company with a place

5    of business at 1 Elm Square, Andover, MA 01810, whose agent for service is Northwest

6    Registered Agent Service, Inc. 8 The Green, Suite B Dover, DE 19901, and is a former

7    shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the initial

8    consideration for which was paid in cash and 10% held in escrow, and additional consideration

9    for which shares is subject to an earn-out based on nVision's performance.

10         20.    BioCardia Lifesciences is informed and believes and on that basis alleges that

11   defendant EXXclaim Capital Partners I, LP ("EXXclaim") is a Delaware Limited Partnership

12   with a place of business at 26010 Torello Ln., Los Altos, CA 94022, whose agent for service is

13   Anula Jayasurtya 26010 Torello Ln., Los Altos, CA 94022, and is a former shareholder of

14   nVision whose shares were acquired by Boston Scientific, 90% of the initial consideration for

15   which was paid in cash and 10% held in escrow, and additional consideration for which shares is

16   subject to an earn-out based on nVision's performance.  BioCardia Lifesciences is informed and

17   believes and on that basis alleges that Anula Jayasuriya founded, and serves as managing director

18   of EXXclaim.  On or around December 4, 2010, while Ms. Sarna was still working at BioCardia,

19   Ms. Jayasuriya reached out to Ms. Sarna via her BioCardia email address and introduced Ms.

20   Sarna to Linda Greub.  Ms. Sarna then followed up with Ms. Greub to request assistance in

21   conceptualizing a catheter system that was the invention of a provisional patent application Ms.

22   Sarna filed while still working at BioCardia.  BioCardia Lifesciences is informed and believes

23   and on that basis alleges that Ms. Jayasuriya knew that BioCardia was a medical device company

24   specializing in catheters.  BioCardia Lifesciences is informed and believes and on that basis

25   alleges that EXXclaim, through its affiliation with Ms. Jayasuriya, were conscious wrongdoers

26   because they acted with the knowledge or despite the known risk that the intellectual property that

27   formed the basis of nVision Medical Corporation had been misappropriated by Ms. Sarna.

28         21.    BioCardia Lifesciences is informed and believes and on that basis alleges that

-7-

defendant Fogarty Institute for Innovation is a California Domestic non-profit company with a place of business at 2490 Hospital Dr., Suite 310, Mountain View, CA 94040, whose agent for service is Gaule Kuokka, 2490 Hospital Dr., Suite 310, Mountain View, CA 94040, and is a former shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

22.     BioCardia Lifesciences is informed and believes and on that basis alleges that defendant Golden Seeds nVision Medical, LLC is a Delaware Limited Liability Company with a place of business at 1192 Cherry Ave, San Bruno, CA 94066, whose agent for service is Harvard Business Services, Inc., 16192 Coastal Hwy., Lewes, DE 19958, and is a former shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

23.     BioCardia Lifesciences is informed and believes and on that basis alleges that defendant Life Sciences Angel Investors VIII, L.L.C. is a Delaware Limited Liability Company with a place of business at 1230 Bordeaux Dr., Sunnyvale, CA 94089, whose registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.  Founded in 2005, Life Science Angels was ranked the top angel investment group in the U.S. by PR Newswire in 2014.  Since 2005, Life Science Angels has invested approximately $50 million in over forty (40) companies, and these companies have received an additional $1 billion in follow up funding from venture capital firms and strategics.

24.     BioCardia Lifesciences is informed and believes and on that basis alleges that defendant LMNVC, LLC ("LMNVC") is a Delaware Limited Liability Company with a place of business at 407 E. Laurel Circle, Palm Springs, CA 92262, whose agent for service is Philip Nevinny-Stickel, 407 E. Laurel Circle, Palm Springs, CA 92262, and is a former shareholder of

-8-

nVision whose shares were acquired by Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance. BioCardia Lifesciences is informed and believes and on that basis alleges that Linda Greub was a partner at LMNVC, LLC from October 2010 to October 2018. On or around December 4, 2010, while Ms. Sarna was still working at BioCardia, Anula Jayasuriya reached out to Ms. Sarna via her BioCardia email address and introduced Ms. Sarna to Ms. Greub. Ms. Sarna then followed up with Ms. Greub to request assistance in conceptualizing a catheter system that was the invention of a provisional patent application Ms. Sarna filed while still working at BioCardia. BioCardia Lifesciences is informed and believes and on that basis alleges that Ms. Greub knew that BioCardia was a medical device company specializing in catheters. BioCardia Lifesciences is informed and believes and on that basis alleges that LMNVC through its affiliation with Ms. Greub, were conscious wrongdoers because they acted with the knowledge or despite the known risk that the intellectual property that formed the basis of nVision Medical Corporation had been misappropriated by Ms. Sarna.

25. BioCardia Lifesciences is informed and believes and on that basis alleges that defendant Seraph nVision, LLC is a Georgia Limited Liability company with a place of business at 2011 Lenox Road NE, Atlanta, GA 30306, whose Registered Agent is Tuff Yen 2011 Lenox Road NE, Atlanta, GA 30306, and is a former shareholder of nVision whose shares were acquired by Boston Scientific, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance. Seraph nVision has ten (10) funds with over 330 investors. Seraph nVision has been investing in companies for fifteen (15) years and has closed 106 deals with 21 exits. Seraph nVision's minimum investment amount is $250,000.

26. BioCardia Lifesciences is informed and believes and on that basis alleges that the aforementioned Shareholder Defendants have best practices and standard operating procedures to perform "due diligence" by which they gather background information on startups seeking funding. BioCardia Lifesciences is informed and believes and on that basis alleges that the Shareholder Defendants are sophisticated companies and investors focused on investments in or

-9-

acquisitions of early-stage companies (each an "Investment Target") and, thus, are familiar with the intellectual property issues that Investment Targets have.  These include, among other things, that a former employer of a founder of an Investment Target might have a claim to ownership of the inventions claimed by the Investment Target, or that the inventions claimed by the Investment Target may be based on trade secrets misappropriated from a former employer because, among other things:

     a.   They had been contractually assigned by the founder to the founder's former employer;

     b.   They were co-invented with an employee or employees of the founder's former employer; or

     c.   They were based on information learned at and/or belonging to the former employer.

## JURISDICTION AND VENUE

27.     BioCardia's complaint arises under the patent laws of the United States, 35 U.S.C. §§ 101 et seq., specifically 35 U.S.C. § 256, the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the laws of the State of California.

28.     This Court has subject matter jurisdiction over BioCardia's patent law claims under 28 U.S.C. §§ 1331 and 1338(a), jurisdiction over BioCardia's Defend Trade Secrets Act claim under 28 U.S.C. § 1331 and has supplemental jurisdiction over BioCardia's state law claims under 28 U.S.C. § 1367.

29.     This Court has general personal jurisdiction over Defendants because the acts out of which this Action arises took place within this District.

30.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

## INTRADISTRICT ASSIGNMENTS

31.     Pursuant to Local Rule 3-2 (c), this case involves intellectual property rights and is subject to assignment on a district wide basis.

## FACTUAL BACKGROUND

### Ms. Sarna's Education and Prior Work Experience

32.     BioCardia Lifesciences is informed and believes and on that basis alleges that Ms.

-10-

1  Sarna's undergraduate major was molecular and cellular biology and that she does not have any

2  graduate degrees.

3         33.    Ms. Sarna's work at BioCardia dealt with tracking device failures, ensuring label

4  compliance, and obtaining materials from vendors.

5  ***Ms. Sarna's Employment Agreement with BioCardia***

6         34.    The facts and claims at issue in this case begin with Surbhi Sarna's employment

7  with BioCardia.  Ms. Sarna started consulting with BioCardia on September 15, 2008 pursuant to

8  a Consulting Agreement executed on August 27, 2008.  On November 3, 2008, Ms. Sarna started

9  working as a full-time employee of BioCardia pursuant to the BioCardia standard Employment

10  Agreement which she signed on October 29 YEAR? (the "Sarna Agreement").  A true and correct

11  copy of the Sarna Agreement with Ms. Sarna's signature is attached hereto as **Exhibit A**.

12         35.    In Section 2(a) of the Sarna Agreement, Ms. Sarna agreed "at all times during the

13  term of my employment and thereafter, to hold in the strictest confidence, and not to use, except

14  for the benefit of [BioCardia], or to disclose to any person, firm or corporation without written

15  authorization of the Board of Directors of the Company, any Confidential Information of

16  [BioCardia]."  Ms. Sarna also agreed that "Confidential Information" meant any BioCardia

17  "proprietary information, technical data, trade secrets or know-how, including, but not limited to,

18  research, product plans, products, services, customer lists and customers (including, but not

19  limited to, customers of [BioCardia] on whom I called or with whom I became acquainted during

20  the term of my employment), markets, software, developments, inventions, processes, formulas,

21  technology, designs, drawings, engineering hardware configuration information, marketing,

22  finances or other business information disclosed to me by [BioCardia] either directly or indirectly

23  ***in writing, orally or by drawings or observation of parts or equipment***."  (Emphasis added.)

24         36.    In section 3(a) of the Sarna Agreement, Ms. Sarna agreed to complete Exhibit A,

25  which was to contain a complete description of all inventions, original works of authorship,

26  developments, improvements, and trade secrets which were made by her prior to her employment

27  at BioCardia.  Ms. Sarna executed Exhibit A and did not identify any inventions, original works

28  of authorship, developments, improvements, and trade secrets which were made by her prior to

-11-

1   her employment at BioCardia.  Ms. Sarna also explicitly stated that she had "No inventions or

2   improvements" to identify.

3



**EXHIBIT A**

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP**

| Title | Date | Identifying Number or Brief Description |
|-------|------|------------------------------------------|
|       |      |                                          |
|       |      |                                          |
|       |      |                                          |
|       |      |                                          |
|       |      |                                          |
|       |      |                                          |
|       |      |                                          |

☑ No inventions or improvements

___ Additional Sheets Attached

Signature of Employee: _____

Print Name of Employee: Surbhi Sarna

Date: 10/29/2008

Highly Confidential                                   BC-BSC_0000518

15      37.     Ms. Sarna agreed in Section 3(b) of the Sarna Agreement to "promptly make full

16   written disclosure to the Company . . . and hereby assign to [BioCardia], or its designee, all my

17   right, title and interest in and to any and all inventions, original works of authorship,

18   developments, concepts, improvements or trade secrets" Ms. Sarna conceived of, developed or

19   reduced to practice during the time period Ms. Sarna was a BioCardia employee.  Ms. Sarna

20   never disclosed, in writing or in any other form, any inventions, original works of authorship,

21   developments, concepts, improvements or trade secrets, that she conceived of, developed, or

22   reduced to practice during her employment at BioCardia.  The first time BioCardia heard of any

23   of these patents or applications was in January 2019, when it became aware of, and began

24   investigating the extent of, Ms. Sarna's misappropriation of BioCardia's intellectual property.

25      38.     The only exception to Ms. Sarna's contractual duty to assign inventions to

26   BioCardia in Section 3(b) of the Sarna Agreement was provided by Section 3(f), which stated

27   "the provisions of this Agreement requiring assignment of Inventions to [BioCardia] do not apply

28

-12-

1  to any invention which qualifies fully under the provisions of California Labor Code Section

2  2870" ("Section 2870").  Exhibit B to the Sarna Agreement sets out Section 2870 as follows:



16  Section 2870 does not apply to the intellectual property Ms. Sarna developed during her

17  employment at BioCardia because (a) she used BioCardia resources as part of the development

18  including, but not limited to, BioCardia trade secret information, BioCardia testing equipment,

19  BioCardia computers, BioCardia's email system, and time she spent during normal business

20  hours developing the intellectual property; and (b) as explained in the sections describing

21  "BioCardia's Business Activities" and the "Meeting Between Dr. Altman and Sarna," the

22  intellectual property Ms. Sarna developed during her BioCardia employment related to

23  BioCardia's business and to an actual or demonstrably anticipated research and development by

24  BioCardia.  BioCardia engaged in extensive efforts to develop Dr. Peter Altman's ideas relating

25  to women's pelvic health, including, but not limited to, conducting extensive discussions with

26  several doctors about developing this technology, creating products like the Morph and Helix

27  catheters that could be adapted to be used to address women's pelvic health issues, obtaining

28  several patents that explicitly indicate they relate to women's pelvic health, and attempting to get

-13-

Ms. Sarna to further develop the technology Dr. Altman disclosed to her into additional BioCardia product offerings.  Dr. Altman's conversations with doctors and with Ms. Sarna reflect "actual and demonstrably anticipated research or development" of BioCardia.

39.     Under Section 3(f) of the Sarna Agreement, Ms. Sarna agreed to "advise [BioCardia] promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed in Exhibit A."  As noted above, Ms. Sarna did not disclose any inventions in Exhibit A to the Sarna Agreement.  Ms. Sarna also never disclosed, in writing or any other form, any inventions she believed fell under Section 2870.

40.     Ms. Sarna also agreed, in Section 3(d) of the Sarna Agreement, to "keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the [BioCardia]."  Ms. Sarna agreed that "the records will be in the form of notes, sketches, drawings and any other format that may be specified by [BioCardia]" and "will be available to and remain the sole property of [BioCardia] at all times."  Ms. Sarna did not maintain the information set out in Section 3(d) for the inventions she made during the term of her employment with BioCardia.  Furthermore, Ms. Sarna did not make adequate and current written records of the inventions she made during her BioCardia employment available to BioCardia despite numerous requests for these materials.

41.     In Section 3(e) of the Sarna Agreement, Ms. Sarna agreed to "assist [BioCardia], or its designee, at [BioCardia's] expense, in every proper way to secure [BioCardia's] rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to [BioCardia] of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which [BioCardia] deems necessary in order to apply for and obtain such rights and in order to assign and convey to [BioCardia], its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Invention."  Ms. Sarna further agreed that her "obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement."  Ms. Sarna never assisted BioCardia to secure the rights in the inventions, copyrights, patents, mask

-14-

1    work rights or other intellectual property rights she developed during her employment at

2    BioCardia.

3        42.    Under Section 4(a) of the Sarna Agreement, Ms. Sarna agreed that during her

4    employment with BioCardia she would not "engage in any other employment, occupation,

5    consulting or other business activity directly related to the business in which [BioCardia] is now

6    involved or becomes involved during the term of [Ms. Sarna's] employment."  Nonetheless, Ms.

7    Sarna founded nVision and worked as an employee and/or consultant of nVision while she was

8    still employed by BioCardia.  During her employment at BioCardia, Ms. Sarna devoted

9    significant time and effort to nVision, often at the expense of her work for BioCardia, which

10   nVision work was directly related to the business of BioCardia and was based on BioCardia

11   confidential information disclosed by Dr. Peter Altman to her so that she would use that

12   information for the benefit of BioCardia.

13       43.    Section 4(b) of the Sarna Agreement required Ms. Sarna, during the term of her

14   employment with BioCardia, to "not accept or perform any outside consulting work without first

15   reporting the nature of and proposed time commitment of any such proposed outside consulting

16   work."  Ms. Sarna never informed BioCardia of her work with nVision, nor of the time

17   commitment of this work.

18       44.    Ms. Sarna agreed, under Section 5 of the Sarna Agreement, that "at the time of

19   leaving the employ of [BioCardia], I will deliver to [BioCardia] (and will not keep in my

20   possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports,

21   proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials,

22   equipment, other documents or property, or reproductions of any aforementioned items developed

23   by me pursuant to my employment with [BioCardia] or otherwise belonging to [BioCardia]."

24   Despite this, on at least eleven separate dates Ms. Sarna emailed BioCardia confidential

25   information to her personal Gmail account:   (1) April 29, 2009; (2) July 7, 2009; (3) November

26   20, 2009; (4) September 8, 2010; (5) October 24, 2010 (two emails); (6) December 29, 2010; (7)

27   February 14, 2011; (8) March 11, 2011; (9) May 9, 2011; (10) September 8, 2011; and (11)

28   December 19, 2011.  Among the BioCardia confidential information were template documents

-15-

for risk analysis, product specifications, labelling verification, and document change order procedures.



45.     In Section 8 of the Sarna Agreement, Ms. Sarna agreed "to diligently adhere to the Conflict of Interest Guidelines attached as Exhibit D" to the agreement.  Exhibit D set out several "potentially compromising situations which must be avoided."  Furthermore, "any exceptions must be reported to the President and written approval for continuation must be obtained."  Ms. Sarna never reported any potentially compromising situation to the President of BioCardia, and she never received written approval to engage in any such action.

46.     Throughout her employment with BioCardia, Ms. Sarna received periodic reminders of her continuing duty to assign inventions to BioCardia.  For example, on at least three occasions, Ms. Sarna received a company-wide email from Gulshan Sharver reminding employees of BioCardia's inventor incentive program and requesting submission of invention disclosure forms.  Ms. Sarna received these emails from Ms. Sharver at least on April 4, 2010; May 27, 2010; and August 24, 2010.  Despite these reminders, Ms. Sarna never disclosed any invention to BioCardia during or after her employment at BioCardia.

47.     Not only did Ms. Sarna fail to disclose any of the inventions she patented on behalf of nVision, she also affirmatively and falsely represented that she did not have any inventions to report to BioCardia.  Exhibit C to the Sarna Agreement was a "Termination Certification," which Ms. Sarna executed on January 4, 2012, the last day she worked for BioCardia.  In this document, Ms. Sarna certified that she "complied with all the terms of the Company's Employment Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement."  At no point during or after her employment with BioCardia did Ms. Sarna identify any inventions she made during the time when she was a BioCardia employee.



48.     Ms. Sarna's Termination Certification also represented that she did not have in her possession, nor had she failed to return, "any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items bellowing to BioCardia."

-17-

1    Ms. Sarna made this representation despite that barely two weeks earlier she forwarded an email

2    to her personal Gmail account attaching a BioCardia template for a verification test plan for the

3    Helix catheter.  BioCardia Lifesciences is informed and believes and on that basis alleges that

4    corresponding nVision documents adopt the structure, format, and even language of this

5    BioCardia template.

6          49.    Ms. Sarna's Termination Certification also represented that she "will preserve as

7    confidential all trade secrets, confidential knowledge, data or other proprietary information

8    relating to products, processes, know-how, designs, formulas, developmental or experimental

9    work, computer programs, data bases, other original works of authorship, customer lists, business

10   plans, financial information or other subject matter pertaining to any business of" BioCardia.

11   ***BioCardia's Business Activities***

12         50.    The BioCardia Entities' product portfolio and marketing efforts focus on the use of

13   its diagnostic strategies, biotherapeutics, and catheter technologies like its Morph and Helix

14   products.  The intellectual property Ms. Sarna claimed as her own and assigned to nVision and

15   the products that Ms. Sarna and nVision developed based on that intellectual property, all relate to

16   catheter products.  As a result, Ms. Sarna's patents, and patent applications, and alleged

17   inventions, all relate to BioCardia's "business" as that term is used in California Labor Code

18   Section 2870, as well as to that of the other BioCardia Entities.  The relevant business for

19   purposes of Section 2870 is catheter medical devices.

20         51.    Regardless, BioCardia, as well as the other BioCardia Entities, also has devoted

21   considerable resources and effort to the treatment of other conditions, including women's pelvic

22   health issues.  The treatment of women's pelvic health conditions is a part of BioCardia's

23   "business" and "actual and demonstrable research or development" (as those terms are used in

24   California Labor Code Section 2870).

25         52.    Almost from its inception, BioCardia investigated whether the catheter technology

26   it was developing could be used to treat gynecological conditions.  Dr. Simon Stertzer, one of the

27   most renowned cardiologists in the world, has continuously served as a consultant for BioCardia

28   and its predecessor from 1999 to the present.  Among his many accomplishments, Dr. Stertzer

-18-

1   pioneered interventional cardiology in the 1970s, performed the first angioplasty, founded

2   Arterial Vascular Engineering (which he later sold to Medtronic for nearly $5 billion), and

3   currently is a Professor Emeritus at Stanford University.  In the years following his

4   groundbreaking work, Dr. Stertzer observed several doctors adapting the devices and procedures

5   he developed for the heart for other parts of the body.  Recognizing the enormous business

6   opportunity this presented, Dr. Stertzer began searching for opportunities to develop BioCardia

7   cardiovascular applications for other parts of the body.

8           53.     That is why in March 2000, Dr. Stertzer called Dr. Peter Altman, the CEO of

9   BioCardia, to discuss the possibility of adapting BioCardia's catheter offerings for gynecological

10  applications.  Dr. Stertzer believed that there was a need to improve the ability to diagnose pre-

11  cancerous and cancerous cysts in a less invasive fashion, as well as new ways to treat them.  At

12  the time, the only way to test for ovarian cancer was to perform surgery or an invasive

13  transcutaneous or transvaginal biopsy, which were, burdensome for the patient, and carry a host

14  of risks.  In Dr. Stertzer's opinion, BioCardia's Helix and Morph catheter technologies and

15  interactive design enabled sufficient control and flexibility to navigate fallopian tubes and

16  contribute to providing this less invasive diagnosis.

17          54.     Dr. Altman, intrigued by the idea, recorded Dr. Stertzer's idea as the first

18  paragraph of a March 23, 2000 lab notebook entry ("the lab notebook disclosure").  In the

19  following pages of the entry, Dr. Altman set out the details of how the Helix and Morph catheters

20  could be adapted for gynecological applications.  As depicted in the images in the lab notebook

21  disclosure, and described in the accompanying text, smaller versions of BioCardia's Morph and

22  Helix steerable catheters could be inserted into a vagina and guided to the fallopian tubes,

23  fimbria, and ovaries.  By adding imaging, diagnostic, and treatment capabilities at the distal end

24  of the catheter, practitioners could observe, test, and treat ovarian state.

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12



13      55.     The lab notebook disclosure detailed "optional **imaging capabilities**," such as
14   ultrasound technology or a fiber optic camera, to steer the catheter and take images inside the
15   vagina.  For example, the notebook notes that "rotating ultrasound probes could be used to guide
16   the catheter to obtain [a] high resolution view of [the] ovarian cyst."  It also notes that
17   "intrafallopian ultrasound" could be used "to determine if further intervention is required."  The
18   notebook also noted that fiber optic imaging could also be used to steer the catheter and capture
19   images within the vagina.

20
21
22
23

24   The **diagnostic capabilities** described in the lab notebook included both "a fluid biopsy probe,
25   such as a hollow helical needle may be rotated into the ovary to obtain a sample of the cyst.  Such
26   a probe could also be used to drain the cyst."  The notebook also noted that solid biopsies, such as
27   "material core" samples, could also be obtained by the described catheter device.
28

1

2

3

4

5

6

7

8

9



10   56.    The lab notebook disclosure also described a variety of **treatment capabilities**

11 administered at the end of the catheter.  For example, the catheter could "be used to deliver RF

12 energy to kill tissue in the cyst, or to deliver alcohol or cytotoxic agents designed to introduce

13 necrosis locally."  In addition, the notebook notes that when the catheter is in position it may be

14 used to advance "therapeutic probes."

15   57.    In addition to a variety of imaging, biopsy, and treatment capabilities, the lab

16 notebook disclosure also noted different locations where the catheter could collect images,

17 diagnose conditions, and administer treatment.  For example, the notebook notes that the catheter

18 can be used for "intrafallopian" diagnosis and treatment:

19   Dermoid, cystadenoma, endometrial polycystic disease, pre-cancerous and cancerous
      cysts may be viewed w/ intrafallopian ultrasound to determine if further intervention is
20   required.

21 Later, the notebook explains that the catheter can be directed to the fallopian tube, where it can

22 diagnose conditions and administer treatments:

23

24   The steerable guide gains access through the vagina to the fallopian tube and may be
      [facilitated] by fiber optic imaging.  The steerable guide once position[ed] may be used to
      advance imaging probes such as rotating ultrasound transducers, biopsy probes,
25   therapeutic probes, or combinations of these.

26 The lab notebook also describes advancing the catheter to the fimbria of the fallopian tubes (i.e.,

27 the fingerlike structures at the end of the fallopian tube that surround the ovaries).

28

-21-

1

2

3

4

5

6





7   The March 2000 lab notebook also describes extending past the fimbria to the ovaries for

8   imaging, diagnosis and treatment.  For example, rotating ultrasound probes could be used to

9   determine if an ovarian cyst is functional or "another type that requires therapy."  The lab

10   notebook also discusses extending a biopsy probe into the ovary to obtain a sample of a cyst.

11

12

13         

14

15

16        58.      As Dr. Stertzer suggested, much of the technology BioCardia develops and

17   markets can be adapted for use in the applications disclosed in the lab notebook.  Both the Morph

18   and Helix catheters, which BioCardia spent decades developing and refining, are steerable guide

19   catheters like the one described in in the lab notebook.  That these catheters are used for

20   cardiovascular treatments does not negate their equal applicability to gynecological treatments.

21   Of course, catheters that are used in the heart would have to be resized and modified before they

22   could be used in smaller anatomical structures like fallopian tubes.

23        59.      BioCardia also devoted significant resources to developing technology that would

24   deliver therapeutic substances for the treatment of cancer at the distal end of a catheter, another

25   feature of the inventions and trade secrets discussed in the March 2000 lab notebook entry.  For

26   example, on December 6, 2005, BioCardia filed a patent application for local catheter-based

27   therapy for cancer including delivery of leading blockbuster agents at the distal tip of the catheter.

28

-22-

1    For the next eight years, BioCardia prosecuted this application until it issued as U.S. Patent No.

2    8,529,550 ("the '550 patent") on September 10, 2013.  The '550 patent included a claim for:

3        A catheter system comprising: a catheter having a proximal end and a distal end; a
         drug delivery structure disposed on the distal end of the catheter, where the
4        structure is a hollow structure with one or more apertures communicating from the
         interior to the exterior of said hollow structure, and a reservoir of a therapeutic
5        agent within said drug delivery structure, said therapeutic agent comprising one of
         antagonists to angiogenic agents, cytotoxic agents, anti-Her-2, and anti CD20, and
6        tumor necrosis factors; said drug delivery structure being disengageable from the
         distal end of the catheter; a mechanism at the proximal end of the catheter for
7        disengaging said drug delivery structure from the distal end of the catheter; and a
         fixation means on said drug delivery structure that may be used within a body of a
8        patient to implant the drug delivery structure to a depth within an intended tissue
         within the body of a patient
9

10       60.    The day after the '550 patent issued, Dr. Altman reached out to Dr. Manuel

11   Rodriguez, a Vice President at Genentech involved with the commercial development of Avastin,

12   one of the most valuable cancer treatment drugs in the world.  In that email, Dr. Altman

13   mentioned that BioCardia had just received the '550 patent, and that this invention together with

14   BioCardia's catheter technology could "enable local delivery of therapeutic agents with ease into

15   the ovary."  Dr. Rodriguez responded favorably to this email, and suggested meeting to discuss

16   the following week.  In the following weeks Drs. Altman and Rodriguez engaged in several

17   conversations about the possibility of further developing BioCardia technology to deliver

18   therapeutic agents as part of treatments for ovarian cancer.

19       61.    The same day that Dr. Altman emailed Dr. Manuel Rodriguez, he sent a nearly

20   identical email to Dr. Ian McNiece, a professor at the University of Texas MD Andersen Cancer

21   Center, the largest cancer center in the United States.  Just as with Dr. Rodriguez, this email

22   began an extensive dialogue between Drs. Altman and McNiece about collaborating to further

23   develop BioCardia catheters for gynecological applications.  In fact, Dr. McNiece was so

24   intrigued by the possibilities of this collaboration that he invited Dr. Altman to visit him at MD

25   Andersen for a day-long meeting to discuss this topic.  Dr. Altman flew to Texas for this meeting,

26   and the two had several follow-up discussions about using BioCardia technology in gynecological

27   applications.

28

-23-

1      62.     BioCardia also engaged in extensive communications with Dr. Camran Nezhat

2   about further adapting BioCardia technology for gynecological applications.  Drs. Nezhat and

3   Altman had longstanding communications on this topic from the present all the way back to 2008.

4   In fact, in December 2008, Dr. Stertzer connected Dr. Altman with Dr. Nezhat to begin this

5   development.  Dr. Altman reached out to Dr. Nezhat to see if they could "connect on local

6   delivery aspects of [BioCardia's] business as it relates to OB GYN."  BC-BSC_0385881.  Dr.

7   Nezhat's response was swift and enthusiastic:

8

9

10

11

12

13

14

15

16

17

18

19   *Id.*  Drs. Altman and Nezhat participated in an hour-long meeting the following week and had

20   several follow-up conversations from that meeting.  BC-BSC_0385880-81.  Dr. Nezhat was so

21   excited about the possibilities BioCardia's catheters presented in the OB GYN space, that, in

22   January 2009, he attempted to set up a presentation where he and Dr. Altman could discuss the

23   options BioCardia catheters offered with reproductive endocrinologists at Stanford University.

24

25

26

27

28

-24-

1
2
3
4
5
6
7
8

> **From:** Lori Arnone <nezhatnursing@yahoo.com>
> **Sent:** Friday, January 23, 2009 3:33 PM
> **To:** Peter Altman <paltman@biocardia.com>
> **Subject:** RE: Dr Nezhat
>
> Dr. Altman
>
> I am still working on getting the Stanford REI doctors information on your product and perhaps trying to get a time for them to get together with you and Dr. Nezhat for a presentation.
>
> Do you have something you can send me via email that is a brief summary of your product that I can include in my email to them?
>
> Thank you
>
> Lori Arnone  CMA-C, CNA
> Clinic Supervisor
> Patient Care Manager
> Surgical Coordinator

9
10   Dr. Altman continued to discuss collaboration opportunities in the OB GYN space with Dr.
11   Nezhat, as evidenced by Dr. Altman's May 2010 invitation for Dr. Nezhat to visit BioCardia:

12
13
14
15
16
17
18
19
20
21

> **From:** Peter Altman
> **Sent:** Wednesday, May 19, 2010 12:51 PM
> **To:** Camran R Nezhat MD.FACOG.FACS. <cnezhat@stanford.edu>
> **Subject:** BioCardia
>
> Dear Camran,
> I would like to extend an invitation for you to visit us at BioCardia and talk about applications of our technologies in OB/GYN.  Andrew Mackenzie is here as VP of OPS and I would invite him to join us.   Alternatively, Andy and I could take you to EVVIA for dinner to discuss.
>
> Best regards,
> Peter
>
>
> Peter Altman, PhD
> President and CEO
> BioCardia, Inc.
> 125 Shoreway Rd.  Ste B
> San Carlos, CA  94070
> 650-226-0121 direct
> 650-255-4532 cell
> 650-226-0120 main
> 650-631-3731 fax
> www.biocardia.com

22
23   63.    BioCardia also engaged in communications with other practitioners about adapting
24   BioCardia technology for gynecological applications, including Dr. Mark Lovitch, Dr. John
     Urquhart.
25
26   64.    Over the years, BioCardia has spent considerable time and resources on obtaining
27   several patents that described applications in the women's pelvic health space based on work that
     was occurring at BioCardia when Ms. Sarna was employed there.  For example, BioCardia filed
28

-25-

U.S. Patent Application No. 13/965,807 on August 13, 2013 and prosecuted the application until it issued as U.S. Patent No. 9,078,994 on July 14, 2015.  BioCardia also filed U.S. Patent Application No. 13/915,516 on June 11, 2013 and prosecuted the application until it issued as U.S. Patent No. 9,022,977.  On August 13, 2013, BioCardia filed U.S. Patent Application No. 13/965,789, which it prosecuted until the application issued as U.S. Patent No. 9,017,284 on April 28, 2015.  BioCardia filed U.S. Patent Application No. 13/965,800 on August 13, 2013 and prosecuted the application until it issued as U.S. Patent No. 9,011,373 on April 21, 2015.  On July 22, 2008, BioCardia filed U.S. Patent No. 12/177,338, which it prosecuted until the application issued as U.S. Patent No. 8,939,960 on January 27, 2015.  BioCardia also filed patent applications which described women's pelvic health applications before Ms. Sarna joined BioCardia.  For example, BioCardia filed U.S. Patent Application No. 11/016,448 on December 17, 2004, and prosecuted the application until it issued as U.S. Patent No. 7,402,151 on July 22, 2008.  Each of these patents explicitly discusses their application to the field of women's pelvic health, in particular to "uterine fibroid biopsy and ablation."  Collectively, these patents alone represent a sustained effort over more than a decade and substantial financial outlay by BioCardia.

***BioCardia's Disclosure of Trade Secrets to Ms. Sarna***

65.     In addition to BioCardia's considerable efforts in the women's pelvic health space, conceiving new methods, developing new catheter-based technology, conferring with several practitioners and companies about the development of women's pelvic health products, and obtaining at least seven patents which described applications in the women's pelvic health space, it also attempted (though unsuccessfully) to get Ms. Sarna to work on these efforts for BioCardia.

66.     Ms. Sarna was not a model employee during her time at BioCardia.  She was often absent from work, citing a repertoire of excuses that BioCardia Lifesciences is informed and believes and on that basis alleges were often untrue and pretextual to give Ms. Sarna more time to work on her own projects while an employee of BioCardia.   She had such difficulty getting to work by 9:00 a.m. that her supervisors modified her work schedule to start at 9:30 a.m. and end at 5:30 p.m.  On at least two occasions she was reprimanded in writing for tardiness evan after this adjustment was made.  Co-workers complained that she would disappear for long stretches during

1    the day, causing delays in projects.  Even when Ms. Sarna was at work, she had trouble focusing

2    on the tasks assigned to her and would often make costly mental errors.

3         67.    Thinking she needed additional motivation, and knowing of her desire to work on

4    women's health applications, Dr. Altman arranged a meeting with Ms. Sarna, in or around May

5    2009, where he spent well over an hour explaining BioCardia inventions and trade secrets in the

6    hope that she would devote a significant portion of her worktime to further development of these

7    technologies.  In particular, Dr. Altman showed Ms. Sarna the March 2000 lab notebook entry,

8    showed her other pages in the lab notebook describing relevant technology, and provided

9    additional trade secrets based on his considerable knowledge and experience with gene

10   expression profiling, all of which was intended to help Ms. Sarna further develop a catheter

11   system for a less invasive method for testing and treating ovarian cancer on behalf of BioCardia.

12        68.    During that meeting, Dr. Altman discussed the potential for early diagnostic and

13   local therapy for ovarian cancer with Ms. Sarna because BioCardia anticipated research and

14   development regarding the ovarian diagnostic/therapy approach detailed in the lab notebook.

15   Without early diagnosis, local therapy for the treatment of ovarian cancer is ineffective because of

16   metastasis.  This concept underlines why BioCardia's core efforts focused on pre-metastasis

17   diagnostics to identify the disease state.

18        69.    BioCardia intended that Ms. Sarna herself was going to participate in that research

19   and development, which is why Dr. Altman disclosed the BioCardia trade secrets to her during

20   the meeting in or around May 2009.  That is also why Dr. Altman shared additional laboratory

21   notebook pages with her in the same meeting session relating to the potential ramifications of

22   early diagnosis and the potential for local therapy.  The images in the March 2000 lab notebook

23   entry clearly show BioCardia's Morph and Helix products passing through the uterus to be used

24   for fallopian tube procedures.  The Morph and Helix were products Ms. Sarna worked on a daily

25   basis, albeit for cardiovascular applications.  Further, at least three other employees of

26   BioCardia—including David Snow, David Sanderson, and Andy Mackenzie—were aware that

27   Dr. Altman had spent time with Ms. Sarna proposing that she work on a women's health project.

28        70.    During the course of the meeting with Ms. Sarna in or around May 2009, Dr.

-27-

Altman disclosed dozens of BioCardia inventions and trade secrets through his explanation of the March 2000 lab notebook entry, other pages of the lab notebook, including pages 1-4 of the lab notebook setting out inventive concepts about controlled-release drug delivery matrices, and his explanation of cutting-edge technical developments in gene expression profiling which enabled detection of cancer from the small number of cells collected from a fallopian tube by the catheter. While the list below sets out specific aspects of the inventions and trade secrets that Dr. Altman disclosed to Ms. Sarna, this intellectual property as a whole, and the subject matter discussed during Dr. Altman's meeting with Ms. Sarna, generally describes a method of obtaining a tissue sample from a fallopian tube for determining ovarian state, including:

    a.   Diagnostic method of using a catheter inserted into a fallopian tube to obtain a solid or liquid biopsy of potentially diseased ovarian tissue or cells by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter and obtaining a sample of tissue through the second catheter that is from the ovary which may be analyzed biologically;

    b.   Diagnostic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and sampling for biologic analysis;

    c.   Diagnostic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with imaging capabilities to enable navigation and sampling for biologic analysis;

    d.   Diagnostic method of inserting a catheter with imaging capability, such as

-28-

cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter, using the imaging capabilities to enable navigation and imaging of ovarian cysts or tumors;

e.   Diagnostic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter, using the imaging capability to enable navigation and imaging of ovarian cysts or tumors;

f.   Diagnostic method of inserting a catheter imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and imaging of an ovarian cyst or tumor, and to take an action selected from the set of (1) characterizing said cyst or said tumor or (2) planning therapeutic intervention of said cysts and said tumors;

g.   Diagnostic method of inserting a catheter imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with imaging capability to enable navigation and imaging of ovarian cysts or tumors and to take an action selected from the set of (1) characterizing said cyst or said tumor or (2) planning therapeutic intervention of said cysts and said tumors;

h.   Diagnostic method and devices for advancing a tissue-sampling element to the fallopian tube, fimbria, or ovary to take a solid or fluid tissue sample, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of

-29-

1  a fallopian tube, advancing a second catheter system having a tissue-sampling
2  element through the guide catheter and advancing the tissue-sampling element to
3  obtain a liquid or solid sample for biologic analysis;

4  i. Diagnostic method and devices to be used for tissue-sampling from the fallopian
5   tube, fimbria, or ovary by taking a solid or fluid tissue sample, by, for example,
6   advancing a guide catheter into the uterus to gain access to the ostium of a
7   fallopian tube, advancing a second catheter system having a penetrating element
8   through the guide catheter and advancing the penetrating element consisting of a
9   hollow helical needle into the fallopian tube, fimbria, or ovary to obtain a liquid or
10   solid sample for biologic analysis;

11  j. Diagnostic method and devices to be used for tissue-sampling from the fallopian
12   tube, fimbria, or ovary by taking a solid or fluid tissue sample, by, for example,
13   advancing a guide catheter into the uterus to gain access to the ostium of a
14   fallopian tube, advancing a second catheter system having a tissue-sampling
15   element through the guide catheter and advancing the tissue-sampling element into
16   the fallopian tube, fimbria, or ovary to obtain a liquid or solid sample for biologic
17   analysis;

18  k. Therapeutic method of inserting a catheter with imaging capability, such as
19   cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube
20   to advance a therapy, by, for example, advancing a guide catheter into the uterus to
21   gain access to the ostium of a fallopian tube, advancing a second catheter system
22   through the guide catheter with imaging capability, to enable navigation and
23   imaging of an ovarian cyst or tumor, and to take an action selected from the set of
24   (1) ablating regions of the ovary, (2) delivering controlled release drug delivery
25   matrices to relevant tissue in and around the ovary, or (3) draining the tissue mass
26   penetrated by the hollow penetrating element;

27  l. Therapeutic method of inserting a catheter with imaging, such as ultrasound
28   imaging, on its distal end into a fallopian tube to advance a therapy, consisting of

1   advancing a guide catheter into the uterus to gain access to the ostium of a
2   fallopian tube, advancing a second catheter system through the guide catheter with
3   ultrasound imaging, to enable navigation and imaging of an ovarian cyst or tumor,
4   and to take an action selected from the set of (1) ablating regions of the ovary
5   using radiofrequency energy or (2) ablating the regions of the ovary by the
6   delivery of alcohol;

7   m.  Therapeutic method and devices to be used through the vagina, uterus, and
8   fallopian tube to advance a hollow element from a catheter to assist with tissue
9   sampling, where, for example, the hollow element is connected to a fluid conduit
10  within the catheter system that is connected to a reservoir outside of the body;

11  n.  Therapeutic strategy for identifying precancerous and cancerous growths based on
12  a diagnosis performed from a locally-obtained sample before evidence of
13  metastasis has appeared by, for example, obtaining a local biological sample
14  derived from the ovary or adjacent fluids to determine that the ovary has a
15  significant possibility of having a malignant cancer, and using this information to
16  determine appropriate treatments;

17  o.  Therapeutic strategy for delivering ablative compounds such as alcohol or ablative
18  energy through a catheter system passed through a vagina, uterus, and fallopian
19  tubes to treat disease or a condition of the ovary in which a penetrating element is
20  advanced into the fallopian tubes, fimbria, or ovary; and

21  p.  The existence of a market need to improve the ability to diagnose precancerous
22  and cancerous cysts minimally invasively with details on the ramifications for
23  therapy with early diagnosis, and strategies for doing so that align with new
24  biological measurement technologies in gene expression and genetic analysis that
25  enable a small sample to identify the presence of disease, including details on the
26  players in the gene diagnosis space looking at blood (CareDx), solid tumor tissues
27  (Genomic health), and cells sloughing from within a body lumen conduit such as
28  that of a bowel movement which passes through the colon (EXACT Sciences).

-31-

71.     Although Ms. Sarna has admitted that Dr. Altman met with her, at least David Sanderson, Andrew Mackenzie, and David Snow knew that Dr. Altman met with Ms. Sarna to discuss a BioCardia project related to women's health.  BioCardia Lifesciences is informed and believes and on that basis alleges that Mr. Sanderson, Mr. Mackenzie, and Mr. Snow will corroborate that this meeting took place.

72.     BioCardia also disclosed trade secrets to Ms. Sarna through her day-to-day work for the company.  In particular, BioCardia internally developed a testing instrument that used a ball and spring assembly to test the internal diameter of catheters.  The particulars of this testing device are set out in the 04960-A TSPEC, titled "Ball Fixture, 0.0710" Internal Inspection," which was produced at BC-BSC_0000379-381.  Ms. Sarna used this device as part of her work for BioCardia, and later incorporated the ball-and-spring feature in nVision patents and/or patent applications.  In particular, BioCardia shared the following trade secret with Ms. Sarna by allowing her to use the ball-and-spring testing instrument:  a catheter system which includes a distal spring element on its end and having a round spherical ball mounted on the spring to avoid damage to the lumen through which it is passed, by, for example, having of a catheter shaft with a hollow lumen, containing a fluid conduit, which passes through a helical metal spring on its distal end attached to a small ball attached to the distal-most end.

73.     Finally, BioCardia disclosed trade secrets to Ms. Sarna in the form of template documents that Ms. Sarna used as part of her work on behalf of BioCardia.  BioCardia strictly controlled access to these documents, and only used them internally.  Ms. Sarna forwarded many of these templates to her personal Gmail account.  BC-BSC_0002529-44; BC-BSC_0002944-3001; BC-BSC_0011792-802; BC-BSC_0013063-119; BC-BSC_0013557-84; BC-BSC_0013585-600; BC-BSC_0014062-63; BC-BSC_0014176-77; BC-BSC_0014339-40; BC-BSC_0014509-14; BC-BSC_0014798-819; BC-BSC_0015207-238.  BioCardia Lifesciences is informed and believes and on that basis alleges that corresponding nVision documents adopt the structure, format, and even language of these BioCardia template documents.  In particular, BioCardia shared the following trade secret with Ms. Sarna by allowing her to use BioCardia template documents:  BioCardia template documents sent to Ms. Sarna's personal email account,

-32-

consisting of the following templates: Risk Analysis, Product Specification, Labelling
Verification, and Document Change Order procedures.

***Ms. Sarna's Misappropriation of BioCardia Trade Secrets During Her Employment at BioCardia***

74.    While it turned out that Ms. Sarna did further develop the BioCardia intellectual property Dr. Altman shared with her, she did not do so on behalf of BioCardia.

75.    On Monday, September 28, 2009, approximately four months after Dr. Altman described to Ms. Sarna the women's pelvic health intellectual property in his lab notebook, Ms. Sarna engaged Pacific Crest Law Partners, LLP.  That same day, Pacific Crest Law Partners incorporated nVision Medical Corporation ("nVision") in Delaware on Ms. Sarna's behalf.  Ms. Sarna never informed BioCardia that she had formed her own corporation.

76.    On Tuesday, September 29, 2009, the day after incorporating nVision, Ms. Sarna called in sick.  Later that same day, Ms. Sarna filed a provisional patent application in the United States Patent and Trademark Office ("USPTO") that she assigned to nVision in a December 26, 2009 Technology Transfer Agreement.  Ms. Sarna never informed BioCardia that she filed this provisional patent application.  Even when BioCardia finally learned of the provisional patent application in 2020 and requested production of the application and any other related documents as part of discovery in the related litigation, Ms. Sarna did not produce the materials.  This is despite Ms. Sarna's promise, in Section 3(d) of the Sarna Agreement, to "keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with [BioCardia]" and her agreement that "the records will be in the form of notes, sketches, drawings and any other format that may be specified by [BioCardia]" and "will be available to and remain the sole property of [BioCardia] at all times."

77.    On Tuesday, February 9, 2010, Ms. Sarna took another sick day off with a second ailment.  Later that same day, Ms. Sarna signed an "Action by Sole Director of nVision Medical Corporation," which gave Pacific Crest Law Partners, LLP a warrant to acquire 40,000 shares in exchange for up to $15,000 in legal fees.

78.    On Friday, December 3, 2010, Ms. Sarna emailed David Snow and Miranda Peto

-33-

to inform them that she would be working from home because she was ill with a third ailment. Later that same day, Ms. Sarna emailed Anula Jayasuriya, then a member of the Board of Trustees of Astia and later the Founder and Managing Director of EXXclaim Capital, to thank her for an introduction to Linda Greub, then a partner at LMN Ventures, LLC.[1]  The date on the email is "Sat 12/4/2010 12:02:36 AM Coordinated Universal Time," which corresponds to 5:02 p.m. on Friday, December 3, 2010.  Because Ms. Sarna could not arrive at work by 9:00 a.m., BioCardia allowed her workday to span from 9:30 a.m. to 5:30 p.m.  Consequently, this email not only was sent using BioCardia's email service, but was also sent during Ms. Sarna's normal working hours. In that same email, Ms. Sarna also asked Ms. Greub for help "conceptualizing a product which



Sent: Sat 12/4/2010 12:02:36 AM Coordinated Universal Time

Anula,

Thank you for the introduction.

Linda,

Pleasure to e-meet you.  I'm currently conceptualizing a product which will diagnose fallopian tube occlusion in the office of the reproductive specialist. I would love to run the idea by you and get your thoughts. I currently work in San Carlos and would be happy to meet you wherever it is most convenient.

Thanks for your time,
Surbhi
cell 408.655.3577

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient.  Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited.  If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

will diagnose fallopian tube occlusion in the office of the reproductive specialist."  BioCardia found this email among Ms. Sarna's **deleted emails**.

79.     Although the email references an earlier email introduction to Ms. Greub by Ms. Jayasuriya, that email is nowhere to be found in Ms. Sarna's BioCardia email account.

80.     BioCardia Lifesciences is informed and believes and on that basis alleges that Ms. Sarna deleted Ms. Jayasuriya's email introducing Ms. Greub and emptied her deleted email folder to permanently eliminate that email, but forgot to empty the folder after she deleted her email requesting assistance from Ms. Greub.  These communications with Ms. Jayasuriya and Ms.

[1] EXXclaim Capital and LMN Ventures were both shareholders in nVision and are named defendants in this litigation.

1  Greub were not to develop products on BioCardia's behalf.  Ms. Sarna never disclosed this

2  product, or any efforts to develop it, to BioCardia.

3      81.    BioCardia Lifesciences is informed and believes and based on the foregoing

4  alleges that Ms. Sarna took many steps to actively conceal her use of BioCardia resources to

5  advance nVision, including deleting other emails sent to and from her BioCardia email account

6  relating to nVision.

7      82.    On Thursday, January 6, 2011, almost exactly a year ***before*** Ms. Sarna left

8  BioCardia, she executed the "nVision Medical Corporation Common Stock Purchase

9  Agreement," whereby Anula Jayasuriya purchased 510,640 shares at $0.001 per share.  Ms. Sarna

10 formalized this agreement on Wednesday, January 12, 2011, when she executed an "Action by

11 Sole Director of nVision Medical Corporation" selling the shares to Ms. Jayasuriya.

12     83.    On Tuesday, January 25, 2011, a little less than a year before Ms. Sarna left

13 BioCardia, Bedi Harmonhinder filed United States Provisional Patent Application No. 61/435,945

14 ("the '945 provisional application") with the USPTO, naming Ms. Sarna as the sole inventor.

15 The '945 provisional application is almost certainly the subject of Ms. Sarna's December 2010

16 email to Anula Jayasuriya and Linda Greub and any subsequent communications, since both that

17 email and the application discuss "a product which will diagnose fallopian tube occlusion in the

18 office of the reproductive specialist."  The '945 provisional application is a very close

19 reproduction of the March 2000 lab notebook entry describing BioCardia's women's pelvic

20 health inventions and trade secrets.  Just like the March 2000 lab notebook, the '945 provisional

21 application describes inserting a steerable catheter that has imaging, diagnostic, and treatment

22 capabilities into a vagina.  According to the '945 provisional application:

23          Another solution is to use a commercially available guidewire, but to have a catheter that
24          contains both the illumination and imaging fibers within it in addition to the biopsy or
           injection needles.
25

26 The provisional application goes on to describe:

27          The invention relates to a novel technology and technique to diagnose, sample and
            treat occlusions of the fallopian tube and other fallopian tube diseases ….  More
28          specifically, the present invention relates to the fimbria end of the fallopian tube and

-35-

facilitates the in-office visual examination of the fallopian tube, further allows diagnostic procedures such as taking a biopsy, and injection of regional therapy, such as but not limited to a biotherapeutic.

For the **imaging capabilities**, the '945 provisional application discloses the same fiber optic and ultrasound techniques disclosed in the March 2000 lab notebook:

For the visualization portion of the catheter, several methods are presented including but not limited to using a fiber optics bundle, sound waves such as an ultrasound-related technique, and light scattering techniques, such as optical coherence tomography (OCT).

In addition to imaging capabilities, the '945 provisional application discusses providing **diagnostic** and **treatment capabilities** in the same catheter:

The working lumen of the device provides a passageway for the physician to have guidance through the fallopian tube via guidewire as well as provide access to the tube for biopsy or local therapeutic delivery.

Like the March 2000 lab notebook describing BioCardia's inventions and trade secrets in the women's pelvic health space, the '945 provisional application also describes accessing the fallopian tubes, with particular emphasis on the fimbria surrounding the ovaries. In fact, the title of the '945 provisional application is "A Transvaginal Device and Technique to Access the Fimbria of the Fallopian Tubes Via the Uterotubal Ostium in Order to Both Diagnose and Treat Occlusions and Disease." The application goes on to state that "the present invention relates to the fimbria-end of the fallopian tube."

84.     Despite its clear relevance to BioCardia's business, and to the actual and demonstrably anticipated research and development that Dr. Altman wanted Ms. Sarna to perform for BioCardia, Ms. Sarna never informed BioCardia that she filed the '945 provisional application.

85.     On August 20, 2011, some five months before leaving BioCardia, Ms. Sarna executed a "Written Consent of the Stockholders of nVision Medical Corporation," which identified Anula Jayasuriya as holding 510,640 shares of common shares and 316,056 seed preferred shares, and LMNVC, LLC (where Linda Greub was a principal) as holding 1,264,223 seed preferred shares.

1       86.    On November 13, 2011, some two months before Ms. Sarna left BioCardia, Kim

2    Rubin filed United States Provisional Patent Application No. 61/559,120 ("the '120 provisional

3    application") with the USPTO, naming Ms. Sarna as the sole inventor.  Although not as similar to

4    the March 2000 lab notebook as the '945 provisional application, the '120 provisional application

5    nevertheless divulged BioCardia inventions and trade secrets.  In particular, the '120 provisional

6    application disclosed a catheter that is inserted into a vagina and directed to the fallopian tube

7    where it is used to take images.  Just as with the March 2000 lab notebook, and the '945

8    provisional application, the '120 provisional application's "visualization portion of the catheter

9    include but are not limited to using a fiber optics bundle" and "sound waves such as an

10    ultrasound-related technique, such as Intravascular ultrasound (IVUS)."  Also like the March

11    2000 lab notebook and the '945 provisional application, the '120 provisional application

12    "invention may be used to access the entire length of the fallopian tube."

13       87.    Despite its clear relevance to BioCardia's business, and to the actual and

14    demonstrably anticipated research and development that Dr. Altman wanted Ms. Sarna to perform

15    for BioCardia, Ms. Sarna never informed BioCardia that she filed the '120 provisional

16    application.

17       88.    During Ms. Sarna's employment with BioCardia, she repeatedly sent confidential

18    BioCardia documents to her personal email account, including a testing plan for the Helix

19    steerable catheter sent just a few working days before she resigned from BioCardia.  Below is a

20    list of these confidential materials that BioCardia has been able to ascertain to date:

21            a.   Morph Target Sheath Packaging Verification Protocol (April 29, 2009)

22            b.   HIC (Helical Infusion Catheter)/UGC (Universal Guide Catheter)

23                Packaging Procedure (April 29, 2009)

24            c.   Pouch Seal Operational Qualification (April 29, 2009)

25            d.   Morph AccessPro Risk Management Plan & Report (July 7, 2009)

26            e.   Morph AccessPro Risk Management Plan & Report (longer version) (July

27                7, 2009)

28            f.   Morph Access Pro Risk Analysis Worksheet (July 7, 2009)

g.  Morph Target Sheath Verification Matrix (July 7, 2009)

h.  Morph Target Sheath Risk Management & Report (July 7, 2009)

i.  BioCardia Engineering Change Order Form (November 20, 2009)

j.  Morph 895 (AD) Catheter Label Verification Protocol (November 20, 2009)

k.  Helical Infusion Catheter 953 Label Verification Protocol (November 20, 2009)

l.  Dekra review of "technical file for the CE marking of the system comprising of Helical Infusion Catheter and Universal Deflectable Guide Catheter" (September 8, 2010)

m.  Generic BioCardia quality assurance procedure for risk management (October 24, 2010)

n.  A presentation analyzing complaints against BioCardia's Morph catheter and explaining BioCardia's response to these complaints (October 24, 2010)

o.  "Complaint 0070 – Summary of Initial Observations of 6F Morph Device" (October 24, 2010)

p.  "02364-A (DH) Essential Requirements UGC [Universal Guide Catheter]" (December 29, 2010)

q.  Spreadsheet tracking failures and responses for BioCardia catheter (February 14, 2011)

r.  "02045-B (REG) Essential Requirements HIC [Helical Infusion Catheter]" (March 11, 2011)

s.  Generic BioCardia Labeling Verification Procedure (May 9, 2011)

t.  "Long HIC [Helical Infusion Catheter] risk analysis" (September 8, 2011)

u.  "Helical Infusion Catheter Risk Management Plan & Report" (September 8, 2011)

v.  "Verification Test Plan for Helix Model 02772" (December 19, 2011)

-38-

89.     On January 4, 2012, Ms. Sarna ended her employment with BioCardia and executed the BioCardia, Inc. Termination Certification, where she:  (1) indicated that she had not retained any BioCardia materials; (2) certified that she had complied with BioCardia's invention assignment agreement, including "reporting of any inventions" she conceived; and (3) agreed to preserve all BioCardia trade secrets, confidential knowledge, proprietary information, products, processes, know-how, designs, and developmental or experimental work, among other things.

90.     BioCardia Lifesciences is informed and believes and on that basis alleges that at the time of her departure, Ms. Sarna retained all the materials identified in paragraph 85 of this complaint and used some or all of those documents for the benefit of nVision.

91.     At no time did Ms. Sarna inform BioCardia that she had filed several patent applications, and Ms. Sarna did not assign those applications to BioCardia but instead to nVision.

92.     By the time of her departure, but unbeknownst to BioCardia, Ms. Sarna had misappropriated BioCardia trade secrets, confidential knowledge, proprietary information, products, processes, know-how, designs, and developmental or experimental work for the benefit of nVision and nVision's future assigns.

93.     At no time prior to her departure from BioCardia did Ms. Sarna inform BioCardia that she had already incorporated a competing medical device company to develop steerable catheters similar to BioCardia's Helix and Morph catheters, or that she had engaged in significant rounds of funding for this competing business.

***Ms. Sarna's Misappropriation of BioCardia Trade Secrets Upon Leaving BioCardia***

94.     After Ms. Sarna left BioCardia, she continued to file patent applications covering BioCardia's confidential intellectual property, and developed catheter products similar to BioCardia's Morph and Helix catheters for gynecological applications.

95.     After leaving BioCardia, Ms. Sarna filed several domestic and foreign patent applications that claimed priority to the '945 provisional application (collectively referred to as "the '945 Provisional Application Family") and which were based on the intellectual property described in Dr. Altman's March 2000 lab notebook and disclosed to Ms. Sarna by Dr. Altman during their meeting in or around May 2009, including but not limited to: PCT/US Patent

Application No. 12/022,619 (filed January 25, 2012), which was published as WO 2012/103,266 (August 2, 2012); U.S. Patent Application No. 13/979,691 (filed January 25, 2012), which was published as 2013/0296686 (Nov. 7, 2013)); U.S. Patent No. 9,173,571; U.S. Patent Application No. 14/929,989 (filed November 2, 2015), which was published as 2016/0151011 (June 2, 2016)); U.S. Patent No. 10,610,149; U.S. Patent Application No. 15/605,407 (filed May 27, 2017), which was published as 2017/0258392 (Sept. 14, 2017)); U.S. Patent Application No. 16/813,117 (filed March 9, 2020), which was published as 2020/0205722 (July 2, 2020); and several foreign counterparts.  By claiming priority to the '945 provisional application, the members of the '945 Provisional Application Family all incorporate BioCardia inventions and trade secrets and all should have been assigned to BioCardia.

96.     Ms. Sarna also filed additional patent applications that claimed priority to the '120 provisional application (collectively referred to as "the '120 Provisional Application Family"), including but not limited to: PCT/US Patent Application No. 12/064,834 (filed November 13, 2012), which was published as WO 2013/071293 (May 16, 2013); U.S. Patent Application No. 14/357,875 (filed May 13, 2014), which was published as 2014/0323859 (Oct. 30, 2014)); and any foreign counterparts.  By their reliance on the '120 provisional application, the members of the '120 Provisional Application Family all incorporate BioCardia inventions and trade secrets and all should have been assigned to BioCardia.

97.     In or around 2013, Ms. Sarna began collaborating with Dr. Albert Chin to further refine the inventions and trade secrets she misappropriated from BioCardia.  Through her collaboration with Dr. Chin, Ms. Sarna developed an everting balloon catheter as the means of obtaining a biopsy in a fallopian tube.  However, the collaboration by Ms. Sarna and Dr. Chin still relied on, and used, BioCardia's inventions and trade secrets in the form of a catheter-based approach to obtain a biological sample from a fallopian tube to determine ovarian state.

98.     Ms. Sarna, Dr. Chin, and a few additional nVision employees filed several foreign and domestic patents on the everting balloon refinement.  The patent applications that claim priority to PCT/US Patent Application No. 14/014472 (collectively referred to as "the '472 Application Family") include, but are not limited to:  U.S. Patent Application No. 14/764,710

-40-

1   (filed July 30, 2015), which was published as 2015/0351729 (December 12, 2015)); U.S. Patent

2   No. 10,646,209; U.S. Patent Application No. 15/053,568 (filed February 25, 016), which was

3   published as 2016/0278747 (September 29, 2016); U.S. Patent No. 10,639,016; U.S. Patent

4   Application No. 16/834,507 (filed March 30, 2020), which was published as 2020/045983

5   (August 6, 2020); U.S. Patent Application No. 15/998,501 (filed August 16, 2018), which was

6   published as 2018/0353161 (December 13, 2018); U.S. Patent Application No. 15/998,507 (filed

7   August 16, 2018), which was published as 2019/0000429 (January 3, 2019); U.S. Patent

8   Application No. 16/834,480 (filed March 30, 2020), which was published as 2020/0245981

9   (August 6, 2020); PCT/US Patent Application No. 17/019700 (filed February 27, 2017), which

10   was published as WO 2017/147586 (August 31, 2017); PCT/US Patent Application No.

11   18/000229 (filed August 16, 2018), which was published as WO 2019/040094 (February 28,

12   2019); and several foreign counterparts.

13        99.    In addition to the '945 Provisional Patent Family, the '120 Provisional Patent

14   Family, and the '472 Application Family described above, Ms. Sarna and nVision filed several

15   additional United States provisional patent applications, including, but not limited to, a "USPTO

16   provisional patent application filed on or around September 29, 2009" (BSC-BC00003116), U.S.

17   Provisional Patent Application No. 62/546,791 (filed August 17, 2017); U.S. Provisional Patent

18   Application No. 62/578,127 (filed October 27, 2017); U.S. Provisional Patent Application No.

19   62/608,027 (filed December 20, 2017); U.S. Provisional Patent Application No. 62/578,168 (filed

20   October 27, 2017); and U.S. Provisional Patent Application No. 62/599,555 (filed December 15,

21   2017 (collectively "the Additional Provisional Applications").   BioCardia Lifesciences is

22   informed and believes and on that basis alleges that the Additional Provisional Applications were

23   based on the confidential BioCardia intellectual property that Dr. Altman shared with Ms. Sarna

24   on or around May 2009.

25

26

27

28

1       100.    In addition to her patenting efforts, Ms. Sarna also developed the Mako

2   catheter.  Aside from sizing differences, the Mako is very similar to BioCardia's Morph and Helix

3   catheters, both of which Ms. Sarna worked on while at BioCardia.  For example, in nVision

4   Medical Corporation's Instructions for Use depict the Mako 7 catheter as "comprised of a

5   catheter and a handle."  BSC-BC00004101.  The handle includes a "luer," which attaches to an

6   "extension tube" that provides liquid to the Mako device.  The handle also includes a "drive

7   wheel," which, when turned by the operator, pushes the liquid provided by the extension tube to

8   the distal end of the catheter where it expands a balloon inside the catheter tip.



*Figure 1 MAKO Device*

16  BioCardia's Morph catheter, for example, presents a similar visual appearance to, and nearly the

17  same components as, the Mako device.  Like the Mako, the Morph is comprised of a catheter and

18  a handle.  The Morph handle includes a "luer," which attaches to an "extension tube" that

19  provides liquid, which is delivered to the heart for treatment.  The Morph handle includes "drive

20  levers," which, when pulled by the operator, push the liquid treatment provided by the extension

21  tube to the distal end of the catheter where it is delivered to the heart.

-42-

1

2



3

4

5

6

7

8

9

10

11

12

13       101.    In addition to her patenting efforts, and the development of the Mako catheter

14   system, Ms. Sarna also misappropriated BioCardia intellectual property from the March 2000 lab

15   notebook entry by disclosing this confidential information to various medical professionals as

16   part of the development process.  BioCardia Lifesciences is informed and believes and on that

17   basis alleges that Ms. Sarna divulged confidential BioCardia intellectual property to at least the

18   following individuals to obtain funding for nVision Medical Corporation, and as part of the Mako

19   development and clinical trial process:  Anula Jayasuriya; Linda Greub; Jesus Magana; Wendy

20   Heigel; Andrew Cleeland; Dr. Tom Shebab; Arboretum Ventures IV, LP; Astia Angel nVision

21   LLC; Catalyst Health Ventures (PF) L.P.; Catalyst Health Ventures Follow-On Fund, L.P.;

22   Catalyst Health Ventures III, L.P.; Catalyst Health Ventures, LP; CHV Investments, LLC; CHV

23   Partners Fund III, L.P.; CHV-E Partners III, L.P.; Draper Associates Investments, LLC; Draper

24   Associates Riskmaster Fund II, LLC; Draper Associates Riskmasters Fund III, LLC; Excelestar

25   Ventures I, LLC; EXXclaim Capital Partners I, LP; Fogarty Institute for Innovation; Golden

26   Seeds nVision Medical, LLC; Life Sciences Angel Investors VIII, LLC; LMNVC, LLC; Seraph

27   nVision, LLC; Dr. Shamila Pramanik; Dr. Jose Garza Leal; Dr. Sarah H. Kim; Dr. Ronny

28   Drapkin; Dr. Mark Morgan; Dr. Barry Berger; Dr. Paul Billings; Dr. Amy Garcia; Dr. Stephen

Grochmal; Dr. Allison Kurian; Dr. Charles Landen; Dr. David Miller; Dr. Bethan Powell; Dr.
Eric Yang; Dr. Elena Gates; Dr. Hector Chapa; Dr. Lynn Marie Westphal; Dr. William Keye; Dr.
Viviane Connor; Dr. Jim Tsaltas; Dr. Douglas Hart; Dr. Andrew Brill; Dr. David Miller; Dr.
Jonathan Berek; Dr. Frederick St. Goar; and various staff members of the individuals and entities.

***BioCardia's First Awareness of Ms. Sarna's Breach of Contract and Misappropriation of
Trade Secrets***

102.     The first time that the BioCardia Entities became aware of Ms. Sarna's breach of
her employment contract, and misappropriation of BioCardia's confidential information, was in
January 2019, after Boston Scientific advised Dr. Altman that it no longer wanted to pursue a
business relationship with BioCardia that previously had been under discussion.  Surprised by this
development and having learned that Boston Scientific had acquired the company Ms. Sarna had
founded, Dr. Altman searched the USPTO website to see what Ms. Sarna was working on.  It was
only after conducting these searches, that Dr. Altman and BioCardia learned that Ms. Sarna had
filed the '945 provisional application and the '120 provisional application during her time at
BioCardia, and that these applications, and several patents that claimed priority to these
applications, were based on the March 2000 lab notebook entry that Dr. Altman described to Ms.
Sarna in or around May 2009.  Dr. Altman describes the experience of seeing the first patent in
2019 as feeling his "blood run cold" as soon as he saw the area she was working in and how
closely it was related to the project he had detailed to her.

103.     Prior to January 2019, the BioCardia Entities were not aware that Ms. Sarna had
founded a competing medical device company that made catheters like BioCardia's Morph and
Helix catheters and was not aware that Ms. Sarna had misappropriated BioCardia's intellectual
property.  Nothing about Ms. Sarna's actions during her employment at BioCardia, or her
communications with BioCardia employees after she left BioCardia, would have put BioCardia
on notice that she had founded a competing company or misappropriated BioCardia's trade
secrets.

104.     For example, Ms. Sarna claims that she openly shared her desire to start her own
company focused on women's health with her colleagues at BioCardia.  Sharing an interest in

-44-

1   starting a medical device company with co-workers is not the same as providing notice that this

2   company will compete with your co-workers or that you plan to misappropriate company

3   confidential information.  While Ms. Sarna may or may not have shared the desire to start a new

4   company, she certainly did not tell BioCardia that this company would compete with BioCardia,

5   that it would misappropriate BioCardia's trade secrets or that it was already founded in 2009

6   while she was a BioCardia employee.

7          105.    Ms. Sarna also claimed that Dr. Altman gave her permission to pursue her own

8   women's health projects on her own time and using her own resources, and that this somehow

9   condones her misappropriation of BioCardia technology.  This plainly is not true.  Dr. Altman

10  never gave Ms. Sarna a blanket permission to start a competing company or to pursue any

11  independent research on women's health.  Almost from the beginning of Ms. Sarna's employment

12  at BioCardia, co-workers were concerned about her absences, her lack of focus at work, and her

13  low productivity.  The idea that Dr. Altman would have encouraged her to pursue outside

14  research, which only would have exacerbated her poor performance at work, is illogical.

15         106.    Ms. Sarna never informed BioCardia, either orally or in writing, that she had filed

16  several provisional patent applications during her BioCardia employment, as required by her

17  employment contract.  In fact, when Ms. Sarna executed her "Termination Certification" on her

18  last day at BioCardia, she affirmatively represented that she had complied with BioCardia's

19  Employment Confidential Information and Invention Assignment Agreement and did not have

20  any patent applications to report.

21         107.    Ms. Sarna's communications with BioCardia employees also did not give

22  BioCardia notice that she had formed a competing company or that she had misappropriated

23  BioCardia intellectual property.  For example, pretty much the only communication Ms. Sarna

24  had with Dr. Altman after she left BioCardia was the email below and a few additional follow-up

25

26

27

28

emails. BC-BSC_0000016.  Needless to say, this did not put Dr. Altman on notice that Ms. Sarna had formed a competing business, breached the Sarna Agreement or that she had misappropriated BioCardia intellectual property.

| | |
|---|---|
| **From:** | Surbhi Sarna |
| **To:** | Peter Altman |
| **Subject:** | catching up |
| **Date:** | Wednesday, January 25, 2012 10:55:55 AM |

Hi Peter,

I have some news -- I'm officially an entrepreneur! As successful and knowledgeable as you are, I would love to get together sometime soon and learn from you. But, I also know how incredibly busy you are - what is your schedule like in the coming weeks?

Looking forward to it,
Surbhi
408.655.3577

108.    Ms. Sarna has asserted that in June 2013, BioCardia's then COO, Mr. MacKenzie, heard Ms. Sarna speak at a conference about nVision, the ovarian cancer detection device she was developing, the design of the devices she was developing, and the patents she had filed for nVision.  This is incorrect.  While Mr. MacKenzie did bump into Ms. Sarna at a conference in 2013, he did not hear her speak, and did not see Ms. Sarna's presentation.  Mr. MacKenzie will testify to the effect that at the 2013 conference he did not learn anything about what nVision was doing, anything about nVision's detection device or its design, or anything about the patents Ms. Sarna had filed for nVision.

109.    Ms. Sarna also cites Mr. MacKenzie's email following up from the 2013 conference as somehow supporting her claim that BioCardia consented to her misappropriation. Below is what Mr. Mackenzie emailed Ms. Sarna after bumping into her at the 2013 conference:

-46-

1
2
3
4
5
6
7
8
9
10
11
12
13



14   Dkt. 1 at Ex. C.  All this email states is that Mr. MacKenzie ran into Ms. Sarna at the 2013

15   conference ("It was really nice to see you this week at the conference."), which is consistent with

16   what he will testify to if asked about this interaction.   What is missing from this email, or any

17   other emails on this topic, is anything to corroborate Ms. Sarna's claim that Mr. MacKenzie saw

18   her 2013 presentation or learned about nVision's products or intellectual property, which he

19   recalls he did not.

20          110.    The BioCardia Entities subsequently learned that, in addition to the intellectual

21   property that nVision acquired covering the intellectual property contained in the March 2000 lab

22   notebook entry, it also had developed a product called the Mako that incorporated much of the

23   same intellectual property described in the lab notebook.

24          111.    After Boston Scientific acquired nVision, it engaged in efforts to rebrand the Mako

25   with its own product name, called Cytuity.  BioCardia Lifesciences is informed and believes and

26   on that basis alleges that Cytuity functions the same as Mako, and, therefore, also implements

27   BioCardia's intellectual property disclosed in the March 2000 lab notebook entry.

28          112.    BioCardia Lifesciences is informed and believes and on that basis alleges that after

1    or simultaneously with its acquisition of nVision, Boston Scientific transferred all of nVision's

2    patents and patent applications, and perhaps its other intellectual property as well, to Boston

3    Scientific Scimed.

4    ***nVision Is Chargeable with Sarna's Wrongful Acts***

5          113.    nVision was directly and primarily liable for its own misappropriations of

6    BioCardia Lifesciences' trade secrets and secondarily liable for Ms. Sarna's misappropriation of

7    BioCardia Lifesciences' trade secrets under the doctrine of respondeat superior because Ms.

8    Sarna, as the president and founder of nVision, was acting within the course and scope of her

9    employment in committing the acts of misappropriation as herein alleged.  *See, e.g., In re Energy*

10   *Securities Litigation*, No. 15-cv-00265-EMC, 2016 WL 324150, *25 (N.D. Cal. Jan 27, 2016).

11                                    **COUNT I**
                          **(Correction of Inventorship under 35 U.S.C. § 256)**
12                        **(Against Defendants nVision and Boston Scimed)**

13         114.    BioCardia realleges paragraphs 1-113, inclusive.

14         115.    BioCardia requests correction of inventorship of U.S. Patent Nos. 9, 173,571,

15   10,610,149, 10,639,016 and 10,646,209.

16         116.    "'[A] joint invention is simply the product of a collaboration between two or more

17   persons working together to solve the problem addressed.'....'People may be joint inventors even

18   though they do not physically work on the invention together or at the same time, and even though

19   each does not make the same type or amount of contribution.'... To be a joint inventor, one must

20   '(1) contribute in some significant manner to the conception or reduction to practice of the

21   invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when

22   that contribution is measured against the dimension of the full invention, and (3) do more than

23   merely explain to the real inventors well-known concepts and/or the current state of the art.'"

24   *Dana-Farber Cancer Center Institute, Inc. v. Ono Pharmaceutical, Ltd.*, 964 F.3d 1365, 1371 (Fed.

25   Cir. July 14, 2020).  Here the requirements for Drs. Stertzer and Altman to be joint inventors are

26   easily met as alleged below.

27         117.    The March 23, 2000 entry that Dr. Altman recorded in his lab notebook disclosed

28   and described several solutions to problems in the field diagnosing, testing, and treating ovarian

-48-

cancer.

118.    The inventions disclosed in the lab notebook are novel and minimally invasive methods of determining ovarian state by adding imaging, testing, and treatment functionality to the end of a steerable catheter system, and guiding that catheter system through a uterus to the fallopian tube, where imaging, testing, and treatment can be conducted, including several different imaging, testing, and treatment options that can be available at the distal end of the catheter; how this catheter system could be applied in different ways depending on the ovarian condition that is to be addressed; use of the catheter system in different locations in a woman's pelvis; and possible use of the catheter to facilitate pregnancies.

119.    Drs. Altman and Stertzer worked collaboratively to develop the inventions disclosed in the March 23, 2000 lab notebook entry.  In March 2000, Dr. Stertzer called Dr. Altman to discuss what he considered to be a good business opportunity for BioCardia.  According to Dr. Stertzer, it would be possible to adapt the Helix and Morph catheters that BioCardia made for cardiovascular applications to be used in fallopian tubes to improve the ability to diagnose pre-cancerous and cancerous cysts in a less invasive way.  Dr. Stertzer believed that once BioCardia's catheters were properly sized, their maneuverability made them ideal for the toruosity of the fallopian tubes.

120.    Dr. Stertzer's contributions to the inventions in the March 2000 lab notebook entry were:  (1) the general idea of adapting BioCardia's catheters for gynecological applications; and (2) relevant physiological information (i.e., information about body parts with which the catheter system would interact).

121.    Dr. Altman built on Dr. Stertzer's ideas by adding his conception of a catheter system that could address this problem.  Dr. Altman's contribution to the March 2000 lab notebook entry's inventions related to the devices that could address the need that Dr. Stertzer identified.

122.    After this initial phone call, Drs. Stertzer and Altman continued to collaborate on the inventions.  In the days following the call, Dr. Altman recorded Dr. Stertzer's ideas in his lab notebook and added descriptions and details about the devices that he contributed to the inventions. Shortly after Dr. Altman had completed the disclosure in the March 2000 lab notebook entry, he reached out to Dr. Stertzer to discuss what he had contributed and further explore the inventions.

-49-

1    This set off a series of communications over the following months and years between the joint

2    inventors on this topic.  During these communications, Dr. Stertzer suggested that Dr. Altman

3    follow up with various practitioners to discuss the possibility of developing the inventions,

4    including Dr. Camran Nezhat.  Dr. Altman then reached out to Dr. Nezhat and began a dialogue

5    about the development and use of the catheter technologies for gynecological applications.

6         123.    BioCardia Lifesciences has standing to bring this correction of inventorship claim

7    because both Dr. Stertzer and Dr. Altman assigned their rights to the inventions disclosed in the

8    March 2000 lab notebook entry to BioCardia through various agreements.

9         124.    For example, under Section 7.1 of this agreement, Dr. Stertzer agreed that to

10   "promptly disclose all Inventions, as defined in Section 1.3 above, to [Hippocratic Engineering]"

11   which "shall be the owner of all Inventions, including all patent rights, trade secrets and other

12   intellectual property rights therein."  Section 1.3 of the agreement defined "Inventions" as "all

13   discoveries, inventions, improvements, developments, products, processes, procedures, techniques,

14   formulae, computer programs, drawings, designs, notes, documents, information and materials first

15   made, conceived, developed or reduced to practice in, the course of Advisor's performance of

16   Advisory Services for [Hippocratic Engineering] in the Field of Advising."  Section 1.1 defined

17   "Advisory Services" as "attending meetings of the Scientific Advisory Board, reviewing research

18   and development projects, reviewing and criticizing technical and/or business opportunities and

19   devising clinical trial strategies and protocols, and other services rendered to [Hippocratic

20   Engineering] in the Field of Advising."  Section 5.3 of the agreement set out how either party may

21   terminate the agreement.  Since the April 1999 signing date, neither Dr. Stertzer nor BioCardia (in

22   its present or previous forms) ever terminated Dr. Stertzer's "Agreement for Scientific Advisor

23   Services."  As a result, Dr. Stertzer assigned his rights to the inventions disclosed in the March

24   2000 lab notebook entry.

25        125.    Dr. Altman assigned his rights to the inventions disclosed in the March 2000 lab

26   notebook entry through his July 1999 employment agreement with BioCardia, which tracks the

27   language of Ms. Sarna's BioCardia employment agreement.

28        126.    Both Dr. Stertzer and Dr. Altman are willing to sign declarations clarifying their

-50-

1    assignments to BioCardia on this subject matter if the Court deems it necessary.

2        127.    Under Section 3(b) of that agreement, Dr. Altman agreed to "promptly make full

3    written disclosure to [BioCardia], will hold in trust for the sole right and benefit of [BioCardia],

4    and hereby assign to [BioCardia], or its designee, all my right, title, and interest in and to any and

5    all inventions, original works of authorship, developments, concepts, improvements or trade

6    secrets." Dr. Altman's employment with BioCardia has been continuous and uninterrupted from

7    July 1999 to the present. Thus, Dr. Altman assigned his rights to the inventions disclosed in the

8    March 2000 lab notebook entry to BioCardia.

9        128.    Shortly after Ms. Sarna began her full-time employment with BioCardia, Dr. Altman

10   sought to enable her entrepreneurial efforts on behalf of BioCardia and get her to work on a

11   skunkworks side project to further develop the inventions described in the March 2000 lab notebook

12   entry. During a one-on-one meeting with Ms. Sarna in or around May 2009, Dr. Altman described

13   and explained the new state of the art possibilities with gene expression profiling and the contents

14   of the March 2000 lab notebook entry. For well over an hour, Dr. Altman explained in great detail

15   the individual aspects of each disclosed invention, taking time to discuss the underlying technology

16   and the significance of these developments. Dr. Altman took this time and provided this detail

17   because he hoped that Ms. Sarna would appreciate the importance of these inventions and play an

18   important role in driving further development, collaborating with Dr. Altman to create a successful

19   business within BioCardia that focused on applications of these inventions.

20       129.    BioCardia Lifesciences is informed and believes and on that basis alleges that Dr.

21   Altman's May 2009 disclosure and March 2000 lab notebook entry was the only possible source

22   of the inventive concepts that Ms. Sarna patented (either jointly or individually) on behalf of

23   nVision. The reason for this is because no one of skill in the art beyond Dr. Altman and Dr. Stertzer,

24   both in March 2000 and when Dr. Altman disclosed the lab notebook inventions to Ms. Sarna, even

25   realized that these inventions were technologically feasible.

26       130.    Gene expression profiling maximized the potential for practitioners to get any useful

27   information from the catheter approach of obtaining a biologic sample from the fallopian tube

28   envisioned by Drs. Stertzer and Altman. This is because the sample can be amplified and it contains

-51-

all of the information on the status of the cells.  In 2000, gene expression profiling did not exist – and BioCardia was one of the leaders in its development.  In 2008, the first gene expression assay ever was approved by the FDA, the ALLOMAP assay which was developed initially under the leadership of Dr. Altman who was CEO for both BioCardia and CareDX even after the companies split in 2002.  Only an extremely small set of people in the entire world realized that something like ovarian cancer could be tested from a small sample of cells, and how to develop these assays to guide life and death clinical decisions.  With the exception of Dr. Altman, none of these people had the necessary experience developing catheter systems to understand the usefulness of combining the two technologies.

131.    In fact, at the time of Dr. Altman's disclosure to Ms. Sarna, BioCardia Lifesciences is informed and believes and on that basis alleges that only three companies were involved in gene expression profiling as a diagnostic product.   Dr. Altman was a member of this elite group of technologists because his team at BioCardia founded CareDx, one of the three gene expression profiling startups that still existed (and does as a public company to this day) at the time of his disclosure to Ms. Sarna.  But even within this small group of people, Drs. Altman and Stertzer, through their work at BioCardia, were the only ones who had sufficient familiarity with catheter devices to conceive of the inventions disclosed in the March 2000 lab notebook entry.  Nobody in the world of gene expression profiling for early cancer diagnosis, other than Altman and Stertzer, had any idea that samples from the fallopian tubes could be obtained which might correlate with ovarian state.

132.    In addition, both in March 2000 and when Dr. Altman disclosed the lab notebook to Ms. Sarna and the potential of gene expression profiling to Ms. Sarna, BioCardia Lifesciences is informed and believes and on that basis alleges that those of skill in the art were not looking at fallopian tubes as a location that could yield useful information about ovarian state.  The prevailing thought at the time held that determining whether a patient had ovarian cancer meant accessing and testing the ovaries themselves.  This was true even as first scientific information became available in 2009 that many cases of ovarian cancer originated in the fallopian tube.

133.    In the following paragraphs, BioCardia Lifesciences identifies the inventive

-52-

1    contributions of Drs. Altman and Stertzer.

2        134.    **U.S. Patent No. 9,173,571 (member of the '945 Provisional Family)**:   Drs.

3    Altman and Stertzer are, at the very least, co-inventors of U.S. Patent No. 9,173,571 ("the '571

4    patent").    For example, Drs. Altman and Stertzer conceived, or at least contributed to the

5    conception, of the highlighted portions of claim 1:

6            1.  A device for maintaining a narrow body lumen, comprising: a hydraulic
         propulsion mechanism and at least one of an imaging portion or a therapeutic
7        portion, said hydraulic propulsion mechanism configured for propelling said
         imaging portion or said therapeutic portion relative to said hydraulic propulsion
8        mechanism and through the narrow body lumen, said hydraulic propulsion
         mechanism including an elongate shaft, wherein the narrow body lumen is distal of
9        a distal end of said elongated shaft; wherein said imaging portion or said therapeutic
         portion, when propelled by said hydraulic propulsion mechanism, is driven distally
10       from said distal end of said elongated shaft and is distally spaced therefrom; and
         a retrieval mechanism for retrieving said imaging portion or said therapeutic
11       portion from the narrow body lumen.

12
13   Drs. Altman and Stertzer both conceived of the "device for maintaining a narrow body lumen"

14   limitation as shown, for example, in the figures and disclosure of the March 2000 lab notebook

15   entry that show the catheter system they invented inserted into the fallopian tubes and the spaces

16   surrounding the inserted catheters.  Drs. Altman and Stertzer both conceived of the "at least one of

17   an imaging or a therapeutic portion" and the "wherein said imaging portion or said therapeutic

18   portion" limitations by, for example, Dr. Stertzer's observation in the March 2000 lab notebook

19   entry that modified BioCardia catheters could image and treat ovarian cancer and Dr. Altman's

20   identification in the same lab notebook entry of different imaging, diagnostic, and treatment

21   capabilities.  Dr. Altman conceived of the "elongate shaft" and "is driven distally from said distal

22   end of said elongated shaft and is distally spaced therefrom" limitations by, for example, his

23   conception of a catheter system in the March 2000 lab notebook entry that involved a guide and a

24   catheter that extended from the guide.  Through the March 2000 lab notebook entry, Drs. Altman

25   and Stertzer contributed to claim 1 of the '571 patent the inventive concepts of inserting a catheter

26   adapted to provide imaging and therapeutic capabilities at its distal end into the fallopian tubes by

27   extending an elongated shaft to image gynecological structures and provide required therapy.

28       135.    **U.S. Patent No. 10,610,149 (member of the '945 Provisional Patent Family)**:

-53-

1    Drs. Altman and Stertzer are, at the very least, co-inventors of U.S. Patent No. 10,610,149 ("the

2    '149 patent").  For example, Drs. Altman and Stertzer conceived, or at least contributed to the

3    conception, of the highlighted portions of claim 1:

4      1.  A Fallopian tube diagnostic device, comprising:  a catheter including a sensing

5    portion and an inflatable portion, wherein one or more objects are detectable in the
     Fallopian tube via the sensing portion; and a solution lumen for providing a

6    solution, the solution being disposable in the Fallopian tube for detecting the one
     or more objects; wherein the inflatable portion is adjacent and proximal to said

7    sensing portion and is configured to inflate in the Fallopian tube to create a space
     around said sensing portion and to create a seal such that the fallopian tube can be

8    filled with the solution.

9    Drs. Altman and Stertzer both conceived of the "fallopian diagnostic device" limitation as shown,

10   for example, in the figures and disclosure of the March 2000 lab notebook entry explaining the

11   catheter system they invented.  Drs. Altman and Stertzer both conceived of the "catheter," "sensing

12   portion," and "one or more objects are detectable in the Fallopian tube via the sensing portion"

13   limitations, by, for example, Dr. Stertzer's contribution to the March 2000 lab notebook entry's

14   disclosure that the inventive catheter could detect and diagnose pre-cancerous and cancerous

15   structures in the fallopian tubes, and by, for example, Dr. Altman's conception of "optional imaging

16   capabilities" in that same lab notebook entry that could be used with the inventive catheter,

17   including, but not limited to, fiber optics, ultrasound, and cameras.  Dr. Altman conceived of the

18   "a solution lumen for providing a solution, the solution being disposable in the Fallopian tube"

19   through the March 2000 lab notebook entry describing catheters with lumens and the description

20   of treatment lumen in the catheter to deliver, for example, alcohol or cytotoxic agents to the distal

21   end of the catheter.  Through the March 2000 lab notebook entry, Drs. Altman and Stertzer

22   contributed to claim 1 of the '149 patent the inventive concepts of inserting a catheter adapted to

23   provide imaging capabilities at its distal end into the fallopian tubes, and using this imaging

24   capability to detect one or more objects in the fallopian tubes.

25     136. **U.S. Patent No. 10, 639,016 (member of the '472 Application Patent Family)**:

26   Drs. Altman and Stertzer are, at the very least, co-inventors of U.S. Patent No. 10,639,016 ("the

27   '016 patent").  For example, Drs. Altman and Stertzer conceived, or at least contributed to the

28

conception, of the highlighted portions of claim 1:

> 1. A process of collecting cells from a tissue surface of a Fallopian tube in a subject comprising: deploying a distal end of a catheter at a proximal end of the tissue surface of the Fallopian tube; everting an inelastic balloon extendible from the distal end of the catheter to contact the tissue surface of the Fallopian tube wherein in response to everting, over-expansion of the Fallopian tube by the inelastic balloon is prevented; partially deflating said balloon to form wrinkles on an outer surface of said balloon and capturing the cells on said wrinkles; and withdrawing said balloon from the subject to collect the cells from the Fallopian tube.

When Dr. Altman described the contents of the March 2000 lab notebook entry to Ms. Sarna, he conveyed the conception of these highlighted limitations to Ms. Sarna, who then provided these concepts as part of her collaboration with Dr. Chin and other nVision employees and consultants that resulted in U.S. Patent No. 10,639,016.  Drs. Altman and Stertzer both conceived of the "process of collecting cells from a tissue surface of a Fallopian tube in a subject" limitation as shown, for example, in the figures and disclosure of the March 2000 lab notebook entry that show a catheter system they invented diagnosing ovarian state in the fallopian tubes.  Both Drs. Altman and Stertzer conceived of the "deploying a distal end of a catheter at a proximal end of the tissue surface of the Fallopian tube" and "extendible from the distal end of the catheter to contact the tissue surface of the Fallopian tube" limitations by, for example, Dr. Stertzer's disclosure in the March 2000 lab notebook entry of navigating a catheter through the fallopian tubes to collect tissue samples to diagnose ovarian state, and Dr. Altman's disclosure in the same lab notebook entry of a catheter that includes implements at its distal end that can perform fluid or material core biopsies in the fallopian tubes.  Both Drs. Altman and Stertzer conceived of the "capturing the cells" and "collect the cells from the Fallopian tube" limitations by, for example, Dr. Stertzer's disclosure in the March 2000 lab notebook entry of a catheter system that could diagnose ovarian state by testing tissue samples from the fallopian tubes, and Dr. Altman's disclosure in the same lab notebook entry of a catheter that has, on its distal end, implements capable of collecting, for example, fluid or material core cell samples from the fallopian tube.  Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 1 of the '016 patent the inventive concepts of a process of collecting cells from a tissue surface of a Fallopian tube in a subject by deploying the

-55-

distal end of a catheter to collect cells from the fallopian tube.

137.    **U.S. Patent No. 10,646,209 (member of the '472 Application Patent Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of U.S. Patent No. 10,646,209 ("the '209 patent").  For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 1:

> 1. A catheter comprising:  a tube having a distal end; a balloon having a distal end secured to the distal end of the tube at a proximal end of the balloon, the balloon having a length, a majority of the length of the balloon being inelastic, said balloon being adapted to evert from an inverted position to a longitudinally extended everted position in a Fallopian tube so as prevent over-expansion of the Fallopian tube during eversion; and an extending portion comprising a filament disposed at the distal end of said balloon moveable between the inverted position and the longitudinally extended everted position with eversion of said balloon; wherein each of said balloon and said filament has an outer surface configured to remove and retain cells from a wall of the Fallopian tube; wherein the filament is configured to curl, spread, fan, ball-up, or expand-out, or combinations thereof, in response to the balloon moving between the inverted position and the everted position.

When Dr. Altman described the contents of the March 2000 lab notebook entry to Ms. Sarna, he conveyed the conception of these highlighted limitations to Ms. Sarna, who then provided these concepts as part of her collaboration with Dr. Chin and other nVision employees and consultants that resulted in U.S. Patent No. 10,646,209.  Drs. Altman and Stertzer both conceived of the "catheter" and "tube having a distal end" limitations by, for example, Dr. Stertzer's disclosure in the March 2000 lab notebook entry of the distal end of a catheter tube navigating the fallopian tubes to collect cells to determine ovarian state, and Dr. Altman's disclosure in the same lab notebook entry of a catheter system having a tube with a distal end that is guided to the fallopian tubes.  Drs. Altman and Stertzer also conceived of the "outer surface configured to remove and retain cells from a wall of the Fallopian tube" limitation by, for example, Dr. Stertzer's disclosure in the March 2000 lab notebook entry of using a catheter system to navigate the fallopian tubes to collect tissue samples to determine ovarian state, and Dr. Altman's disclosure of implements at the distal end of the catheter that are capable of collecting fluid and material core samples from the fallopian tubes. Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 1 of

the '209 patent the inventive concepts of the distal end of a catheter tube being equipped with implements capable of collecting cells from the wall of the fallopian tube so that tests may be performed to determine ovarian state.

138.     As alleged herein, BioCardia Lifesciences did not discover, and could not have discovered, its correction of inventorship claims through the exercise of reasonable diligence, until December 2018 or January 2019.  Ms. Sarna fraudulently concealed her wrongful acts, postponing the accrual of BioCardia Lifesciences' claims and therefore the beginning of the running of the statute of limitations until BioCardia Lifesciences  actually discovered the fraudulent acts, because among other things as herein alleged,  Ms. Sarna (a) concealed her wrongdoing from the BioCardia Entities which (b) she was contractually obligated to disclose to BioCardia (c) which concealment she did with the intent to defraud BioCardia (d) of which fraudulent acts BioCardia Lifesciences was unaware until January 2019 and upon which BioCardia  Lifesciences would have acted earlier had it been earlier aware of them, causing BioCardia Lifesciences to sustain the damage alleged herein.

139.     Drs. Altman and Stertzer are omitted inventors on U.S. Patent Nos. 9, 173,571, 10,610,149, 10,639,016 and 10,646,209.  Moreover, BioCardia is a proper assignee of Drs. Altman and Stertzer's ownership interest in U.S. Patent Nos. 9, 173,571, 10,610,149, 10,639,016 and 10,646,209..

140.     BioCardia requests correction of inventorship of U.S. Patent Nos. 9, 173,571, 10,610,149, 10,639,016 and 10,646,209 to name Dr. Peter Altman and Dr. Simon Stertzer as co-inventors.

## COUNT II
### (Breach of Contract Against Ms. Sarna and Disgorgement of Unjust Enrichment Against All Defendants)

141.     BioCardia Lifesciences realleges paragraphs 1-140, inclusive.

142.     The Sarna Agreement is a valid and enforceable contract with BioCardia.

143.     BioCardia has duly performed all conditions, covenants, and promises required on its part to be performed pursuant to the Sarna Agreement.

144.   Ms. Sarna breached her contractual obligations to BioCardia under the Sarna Agreement by, *inter alia*:

a.     Failing to preserve the confidentiality of BioCardia trade secrets and only using BioCardia confidential information for the benefit of BioCardia, as required by Section 2(a) of the Sarna Agreement;

b.     Failing to disclose to and assign to BioCardia each of the patents and patent applications in the '945 Provisional Patent Family, '120 Provisional Patent Family, '472 Application Family, and the Additional Provisional Applications, as required by Section 3(b) of the Sarna Agreement;

c.     Failing to keep and maintain adequate and current written records of all inventions she made during her term of her employment with BioCardia, as required by 3(d) of the Sarna Agreement;

d.     Failing to assist BioCardia in "in every proper way to secure" its rights in the inventions Ms. Sarna made during her employment at BioCardia, as required by Section 3(e) of the Sarna Agreement;

e.     Although Ms. Sarna now claims that the inventions she patented during her employment with BioCardia were covered by California Labor Code Section 2870, Ms. Sarna never disclosed those inventions to BioCardia in writing, as required by Section 3(f) of the Sarna Agreement;

f.     Engaging in "employment, occupation, consulting or other business activity directly related to the business" of BioCardia when she founded and worked on behalf of nVision, as prohibited by Section 4(a) of the Sarna Agreement;

g.     By engaging in consulting work on behalf of nVision without first reporting the nature of the work and the time commitment of the proposed work, as prohibited by Section 4(b) of the Sarna Agreement;

h.     Keeping in her possession, and using for the benefit of nVision, confidential BioCardia documents that she emailed to herself, as prohibited by Section 5 of the Sarna Agreement; and

-58-

i.      Violating several items in the BioCardia Conflict of Interest Guidelines, as prohibited by Section 8 of the Sarna Agreement.

145.    BioCardia Lifesciences is informed and believes and on that basis alleges that the Shareholder Defendants are sophisticated companies and investors focused on investments in or acquisitions of early-stage companies (each an "Investment Target") and, thus, are familiar with intellectual property issues that Investment Targets have.  These include, among other things, that a former employer of a founder of an Investment Target might have a claim to ownership of the inventions claimed by the Investment Target, or that the inventions claimed by the Investment Target may be based on trade secrets misappropriated from a former employer because, among other things.

a.   They had been contractually assigned by the founder to the founder's former employer;

b.   They were co-invented with an employee or employees of the founder's former employer; or

c.   They were based on information learned at and/or belonging to the former employer.

146.    BioCardia Lifesciences is informed and believes and on that basis alleges that because of, among other things, the intellectual property issues that an Investment Target might have with a founder's former employer, the Shareholder Defendants customarily perform "due diligence" on an  Investment Target focusing particularly on ferreting out any issues that might exist with the Investment Target's ownership or right to use its purported technology and intellectual property.

147.    BioCardia Lifesciences is informed and believes and on that basis alleges that the Shareholder Defendants focused on investments in and acquiring early-stage medical device companies and, therefore, knew, or at least should have known, that BioCardia, the company nVision's founder, Ms. Surbhi Sarna, worked for immediately prior to nVision, was also a medical device company working on the same type of medical device that nVision planned to work on:  diagnostic catheters.

148.    BioCardia Lifesciences is informed and believes and on that basis alleges that, as

-59-

1    specialists in investments in or acquisitions of early stage medical device companies, the

2    Shareholder Defendants knew or at least should have known there was a heightened risk – well

3    beyond the risks inherent in any early stage company - that nVision's technology and intellectual

4    property actually belonged to BioCardia.

5         149.    BioCardia Lifesciences is informed and believes and on that basis alleges that, in

6    addition to the heightened risk inherent in the fact that nVision was focused on the same type of

7    medical device development as was BioCardia (diagnostic catheters), the Shareholder Defendants

8    knew that there was a likelihood that nVision's claimed technology and intellectual property

9    actually belonged to or had been misappropriated from BioCardia, because they knew or at least

10   should have known through their due diligence of nVision that:

11            a.    Ms. Sarna's undergraduate major was molecular and cellular biology.  She

12       does not have any graduate degrees.  Her work at BioCardia dealt with tracking device

13       failures, ensuring label compliance, and obtaining materials from vendors.  While at

14       BioCardia, Ms. Sarna's work responsibilities did not include designing or developing

15       medical devices.  BioCardia Lifesciences is informed and believes and on that basis

16       alleges that Ms. Sarna's only other experience in the medical device space involved

17       similar tasks as the ones she performed at BioCardia.  Ms. Sarna's age, education, and

18       work experience were highly unusual for someone who allegedly came up with a medical

19       device and technique so revolutionary that a company like Boston Scientific would value

20       it at hundreds of millions of dollars.

21            b.    Ms. Sarna started consulting with BioCardia on September 15, 2008 and

22       became a full-time employee of BioCardia on November 3, 2008, at which time she

23       signed the Sarna Agreement, and where she worked until resigning in January 2012;

24            c.    Ms. Sarna registered nVision as a Delaware corporation on September 28,

25       2009, the year after she joined BioCardia and more than two years before she left

26       BioCardia and apparently ran it in "stealth mode" to conceal its existence from BioCardia;

27

28

1      d.      Ms. Sarna entered into a "Technology Transfer Agreement" "effective as

2  of December 26, 2009 between Surbhi Sarna (the 'Founder'), and nVision Medical

3  Corporation, a Delaware corporation" more than two years before she left BioCardia.

4      e.      In the Technology Transfer Agreement, Ms. Sarna assigned to nVision

5  "All rights, title and interests in and to all intellectual property arising out of or related to

6  the 'nVision Medical; business plan, including, without limitation, all ideas, designs,

7  techniques, processes, formulas, trade secrets, inventions, discoveries, improvements,

8  research or development and test results, specifications, data, know-how, business

9  methods, marketing plans, other business plans, strategies, forecasts, unpublished

10 financial information, budgets, projections, business prospects, copyrights and trademarks

11 (inclusive of all goodwill relate thereto), and the following trademark, copyright, and

12 patent applications and registrations."  The patent application identified in the Technology

13 Transfer Agreement is a "USPTO provisional patent application filed on or around

14 September 29, 2009."

15     f.      Ms. Sarna only registered nVision to do business in California on February

16 21, 2012, about a month after she left BioCardia, when, BioCardia Lifesciences is

17 informed and believes and on that basis alleges, she believed it was no longer possible to

18 conceal nVision's existence from BioCardia.

19     g.      BioCardia Lifesciences is informed and believes and on that basis alleges

20 that the ***incorporation*** of nVision more than two years ***before*** Ms. Sarna left BioCardia,

21 and the ***registration*** of nVision to do business in California only ***after*** she had left

22 BioCardia, alone should have set off alarm bells in any competent due diligence

23 conducted by or for anyone seeking to invest in nVision;

24     h.      Ms. Sarna, in common with most Silicon Valley employees, was

25 contractually obligated to assign to BioCardia inventions she made while working at

26 BioCardia (see **Exhibit A** attached hereto-the Sarna Agreement), subject only to her

27 proving that they were excluded by Labor Code § 2870, which BioCardia Lifesciences is

28 informed and believes and on that basis alleges that anyone seeking to invest in nVision

would understand was unlikely given that both nVision and BioCardia were in the same general area of medical devices (diagnostic catheters);

i.      On January 25, 2011, while a BioCardia employee and a year before Ms. Sarna left BioCardia, Ms. Sarna filed U.S. Provisional application No. 61/435,945 ("the '945 provisional patent application");

j.      On December 3, 2010, while still a BioCardia employee and a year before Ms. Sarna left BioCardia, Ms. Sarna emailed Anula Jayasuriya, then affiliated with Defendant Astia Angels nVision LLC and later affiliated with Defendant EXXclaim Capital Partners I, L.P., and Linda Greub, then a partner at Defendant LMNVC, LLC, from her BioCardia account requesting help conceptualizing the invention of the '945 provisional patent application;

k.      Ms. Sarna subsequently filed three other published applications claiming priority to the '945 provisional patent application;

l.      On November 13, 2011, also while still a BioCardia employee, Ms. Sarna filed a provisional application entitled "Device and method to confirm occlusion of the fallopian tube"; and

m.      Ms. Sarna subsequently filed Application No, 14/357,875, which claimed priority to the '120 provisional patent application.

150.    BioCardia Lifesciences is informed and believes and on that basis alleges that the Shareholder Defendants knew, or at least should have known, that the filing of all of these patent applications while Ms. Sarna was employed by BioCardia, but which were assigned to nVision, meant that the patent applications likely had been contractually assigned to BioCardia.

151.    BioCardia Lifesciences is informed and believes and on that basis alleges that the Shareholder Defendants also knew, or at least should have known, that the filing of all of these patent applications while Ms. Sarna was employed by BioCardia, but which were assigned to nVision, meant that there likely were unnamed BioCardia co-inventors on some or all of the patent applications.

152.    BioCardia Lifesciences is informed and believes and on that basis alleges that the

-62-

Shareholder Defendants also knew, or at least should have known, that the filing of all of these patent applications while Ms. Sarna was employed by BioCardia, but which were assigned to nVision, together with the other acts alleged above while Ms. Sarna was a BioCardia employee, meant that nVision's purported technology and intellectual property likely was based on misappropriated BioCardia trade secrets.

153.    The risks undertaken by an investor who knows or should know that the technology and intellectual property claimed by an Investment Target likely belongs to a former employer as is with the case with the patents Ms. Sarna was contractually obligated to assign to BioCardia, or is likely based on trade secrets misappropriated from a former employer, is unlike any common investment and market risk.  While common investment risks, if realized, might operate to reduce the value of the Investment Target and, therefore, the value of the investor's investment, an investor who knows or should know that the technology and intellectual property claimed by an Investment Target is likely based on patents rightfully owned by another or trade secrets misappropriated from another is exposed to the equitable rights of the rightful owner of the technology and intellectual property, including, as alleged below, the risk of disgorgement of all benefits of the investment.

154.    Here, the Shareholder Defendants' investment in nVision was made with the actual or imputed knowledge that the technology and intellectual property claimed by Ms. Sarna and nVision was likely based on patents belonging to and trade secrets misappropriated from BioCardia; accordingly, they did not undertake a common investment risk but, rather, undertook the risk of disgorgement of all benefits from their investment.

155.    The Shareholder Defendants' liability to BioCardia Lifesciences is direct, not vicarious, and does not require piercing nVision's corporate veil.

156.    BioCardia Lifesciences is informed and believes and on that basis alleges that the Shareholder Defendants made a conscious decision to participate in and further the wrongful acts of nVision and Ms. Sarna by investing in nVision and providing it with the funding necessary to commit the acts as herein alleged.

157.    Alternatively, BioCardia Lifesciences is informed and believes and on that basis

-63-

1  alleges that the Shareholder Defendants were conscious wrongdoers because they acted with the

2  knowledge or despite the known risk that nVision and Ms. Sarna had acted in violation of

3  BioCardia Lifesciences' rights.  Their investments in nVision were made "despite a known risk

4  that the conduct in question violate[d] the rights of [BioCardia]."  Under California law and

5  Sections 51(3)(b) and 3 comment e, of the Restatement (Third) of Restitution and Unjust

6  Enrichment, their decision to invest in nVision despite that known risk of liability – i.e.,  despite

7  that "known unknown" – renders them "conscious wrongdoers" and places upon them the risk of

8  liability by a disgorgement measure.

9        158.    BioCardia Lifesciences is informed and believes and on that basis alleges that the

10  Shareholder Defendants provided funding to nVision that was a substantial factor in enabling

11  nVision and Ms. Sarna to commit the acts as herein alleged, and that the Shareholder Defendants

12  knowingly benefited from the acts as herein alleged.

13        159.    The Shareholder Defendants are required to disgorge to BioCardia Lifesciences

14  the amount of their unjust enrichment as a result of the acts alleged, including at least the amount

15  Boston Scientific paid the Shareholder Defendants for their shares of stock in nVision.

16        160.    BioCardia Lifesciences is informed and believes and on that basis alleges that

17  Fortis, as Stockholders' Representative, is holding in trust approximately ten percent (10%) of the

18  amount paid by Boston Scientific for the nVision stock of the Shareholder Defendants, among

19  other shareholders, resulting from their provision of funding to nVision that was a substantial

20  factor in enabling nVision and Ms. Sarna to commit the acts as herein alleged, and therefore

21  Fortis is required to disgorge to BioCardia Lifesciencesthe amount it holds in trust for the

22  Shareholder Defendants.  The Shareholder Defendants are required to direct Fortis to disgorge to

23  BioCardia Lifesciences any amounts received from Boston Scientific that Forits is holding for the

24  benefit of the Shareholder Defendants as a result of the Shareholders Defendants' unjust

25  enrichment as a result of the acts alleged, including at least the amount Boston Scientific paid the

26  Shareholder Defendants for their shares of stock in nVision.

27        161.    As a further direct and proximate result of Ms. Sarna's breaches of the Sarna

28  Agreement, Defendants have been unjustly enriched for example, in an amount equal to at least

-64-

1    what Boston Scientific paid for nVision.  Defendants have been enriched by Ms. Sarna's breaches

2    of contract, reaping benefits they would not otherwise have achieved in the absence of the

3    breaches.  Defendants received benefits in the form of intellectual property and money based on

4    Ms. Sarna's breaches of contract as alleged above.  Defendants' retention of the benefits they

5    received from Ms. Sarna's breaches of contract is unjust as Ms. Sarna was not contractually

6    permitted to share these benefits with anyone else.   As such, BioCardia is entitled to

7    disgorgement of all of Defendants' profits and consequential gains reaped from their unjust

8    enrichment as a result of Ms. Sarna's breaches of the Sarna Agreement.

9         162.    In addition, a constructive trust should be imposed on nVision and Boston Scimed

10   on all right, title and interest  to the '945 Provisional Application Family, the '120 Provisional

11   Application Family, the '472 Application Family, and the Additional Provisional Applications

12   and the trade secrets and other intellectual property taken by Ms. Sarna, and nVision and Boston

13   Scimed should be ordered to transfer or assign to BioCardia all of the forgoing.

14                                    **COUNT III**
     **(Misappropriation of Trade Secrets under California Uniform Trade Secrets Act Under**
15                **California Civil Code Sections 3426 et seq**
          **(Against Ms. Sarna, nVision and Boston Scientific and Disgorgement Against All**
16                                    **Defendants)**

17

18        163.    BioCardia Lifesciences realleges paragraphs 1-162 inclusive.

19   **Elements of Trade Secret Claim**

20        164.    A trade secret is "information, including a formula, pattern, compilation, program,

21   device, method, technique, or process, that: (1) Derives independent economic value, actual or

22   potential, from not being generally known to the public or to other persons who can obtain

23   economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable

24   under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).

25        165.    To plead a claim for trade secret misappropriation, a plaintiff must allege: "(1) the

26   plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade

27   secret through improper means, and (3) the defendant's actions damaged the plaintiff." *Sargent*

28   *Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003); *Space Data Corp. v. X*, 2017

1  U.S. Dist. LEXIS 22571 at *3, 2017 WL 5013363 (N.D. Cal. Feb. 16, 2017). "Improper means"

2  is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to

3  maintain secrecy, or espionage through electronic or other means." Cal. Civ. Code. § 3426.1(a).

4       166.   Courts distinguish between "direct" and "indirect" trade secret misappropriation,

5  the difference being whether the defendant obtained the trade secrets directly from the plaintiff or

6  indirectly "from someone other than plaintiff." *See Heller v. Cepia, L.L.C.*, 2012 U.S. Dist.

7  LEXIS 660 at *17, 2012 WL 13572 (N.D. Cal. Jan. 4, 2012). A claim for indirect trade secret

8  misappropriation must allege facts showing that the defendant: "(a) knew or had reason to know

9  before the use or disclosure that the information was a trade secret and knew or had reason to

10 know that the disclosing party had acquired it through improper means or was breaching a duty of

11 confidentiality by disclosing it; or (b) knew or had reason to know it was a trade secret and that

12 the disclosure was a mistake." *Cal. Police Activities League v. Cal. Police Youth Charities, Inc.*,

13 2009 U.S. Dist. LEXIS 20507 at *8, 2009 WL 537091 (N.D. Cal. Mar. 3, 2009).

14 **The Statute of Limitations Was Tolled Until BioCardia Became Aware of nVision's**

15 **Misappropriation**

16      167.   The statute of limitations for breach of a contractual obligation to preserve a trade

17 secret does not start until the breach was, or reasonably should have been discovered. *See, e.g.,*

18 *April Enterprises, Inc. v. KTTV*, 147 Cal.App.3d 827, 831 (1983). The reason for this is that it is

19 often difficult or impractical for a trade secret owner to determine whether someone has

20 misappropriated a trade secret. It would be inequitable for the statute of limitations to be

21 triggered by a breach, and even run, before the aggrieved party even realizes it has been harmed.

22      168.   As more fully described in the discussion of "BioCardia's First Awareness of Ms.

23 Sarna's Breach of Contract and Misappropriation of Trade Secrets" above, during and after her

24 employment with BioCardia, Ms. Sarna and nVision concealed the trade secret misappropriation

25 from detection. For example, Ms. Sarna never informed BioCardia that she had incorporated

26 nVision Medical Corporation during her employment, or that nVision would develop a catheter

27 system that would compete with BioCardia's efforts to adapt its catheter offerings for use in

28 gynecological applications. Ms. Sarna also never informed BioCardia that during her

employment she filed multiple provisional patent applications covering BioCardia trade secrets described in the March 2000 lab notebook entry that Dr. Altman explained to Ms. Sarna in or around May 2009 and assigned them to nVision.

169.    Ms. Sarna's and nVision's fraudulent concealment of her wrongful acts tolled the statute of limitations for BioCardia's misappropriation claims.  Therefore, the running of the statute of limitations was delayed until January 2019, when BioCardia actually discovered the fraudulent acts, because among other things, Ms. Sarna and nVision (a) concealed her wrongdoing from BioCardia which (b) she was contractually obligated to disclose to BioCardia (c) which concealment she did with the intent to defraud BioCardia (d) of which fraudulent acts BioCardia was unaware until January 2019 and upon which BioCardia would have acted earlier had it been earlier aware of them, causing BioCardia to sustain the damage alleged herein.

**Trade Secrets Disclosed During Meeting Between Dr. Altman and Surbhi Sarna**

170.    **Diagnostic method of using a catheter inserted into a fallopian tube to obtain a solid or liquid biopsy of potentially diseased ovarian tissue or cells by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter and obtaining a sample of tissue through the second catheter that is from the ovary which may be analyzed biologically**:

a.    This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known and is subject to reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b.    This trade secret derived both actual and potential value from not being generally known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this

1     trade secret.

2              c.      BioCardia undertook reasonable efforts to preserve the secrecy of this trade

3     secret.  The only place where the secret was disclosed was in the March 2000 entry in Dr.

4     Altman's lab notebook.  Dr. Altman kept this lab notebook in a secure location in his

5     office.  Access to the notebook itself was restricted, and, prior to this litigation, only four

6     people had seen the contents of this notebook entry related to this disclosure:  Daniel

7     Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna.  Each of these people

8     entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic

9     Engineering, to prevent disclosure to the public.  Furthermore, BioCardia internal

10    documents containing confidential information were labelled "confidential" and all

11    documents containing BioCardia confidential information that were distributed externally

12    were marked "confidential."  For example, BioCardia employees received, and BioCardia

13    lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to

14    preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the

15    facilities and were escorted by a company employee at all times.  BioCardia has never had

16    more than approximately twenty employees and an appropriately sized facility, so the

17    presence of an unauthorized person would be recognized.

18             d.      BioCardia Lifesciences is the owner of this trade secret because the two

19    individuals who conceived of and developed the trade secret, Drs. Peter Altman and

20    Simon Stertzer, both assigned all right, title, and interest in the intellectual property to

21    BioCardia, or its predecessor Hippocratic Engineering.

22             e.      Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he

23    described and explained a March 2000 lab notebook entry to her during an hour-long

24    meeting.  The following excerpts are examples of disclosures from the notebook that

25    describe this trade secret:

26

27

28

BIOCARDIA LIFESCIENCES, INC. COMPLAINT

 



        f.      nVision directly misappropriated this trade secret by disclosing and using the trade secret through improper means.  For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia.  For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret.  Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device such that the everting balloon at the distal end of the catheter is used to collect cells from the fallopian tube practices this trade secret.  Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of potentially diseased cells in the fallopian tube.  BioCardia Lifesciences is informed and believes and on that basis alleges that nVision also misappropriated this trade secret through improper disclosure when, for example, it consulted with various physicians

-69-

about the design, development, or clinical trials for the Mako device.   As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g.       nVision directly and indirectly misappropriated this trade secret.  For example, nVision obtained this trade secret from Ms. Sarna.  nVision knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia.  Another example of nVision's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity.  When Cytuity everts a balloon at the distal end of the catheter to collect a sample of potentially diseased cells from the fallopian tube, it practices this trade secret.  Furthermore, Boston Scientific and Boston Scientific Scimed developed documentation for Cytuity as a result of nVision's misappropriation.  *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing an everted balloon at the distal end of the catheter collecting potentially diseased cells in the fallopian tube for analysis).  BioCardia Lifesciences is informed and believes and on that basis alleges that nVision misappropriated this trade secret through improper disclosure when, for example, it consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h.       nVision's misappropriation damaged BioCardia Lifesciences.  For example, because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's commercialization of this trade secret prevented the BioCardia Entities from having a monopoly on the method, along with the financial benefits that monopoly would

-70-

confer.

171.   **Diagnostic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and sampling for biologic analysis**:

a.      This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known and is subject to reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b.      This trade secret derived both actual and potential value from not being generally known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.  Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c.      BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.  The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.  Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential."  For example, BioCardia employees received, and BioCardia

-71-

lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times.  BioCardia has never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d.      BioCardia Lifesciences is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e.      Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following excerpts are examples of disclosures from the notebook that describe this trade secret:

 

f.      Ms. Sarna and nVision directly misappropriated this trade secret by disclosing and using the trade secret through improper means.  For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia.  For example, claim 1 of PCT/US Patent Application No. 2012/022,619 sets out all the components of this trade secret.  nVision's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device utilizes imaging capability at the distal end of the catheter as described in this trade secret.  Mako documentation, such as the instructions

1    for use, also disclose this trade secret since the documents describe using a catheter with imaging

2    capability at the distal end of the catheter in a manner described in this trade secret.  BioCardia

3    Lifesciences is informed and believes and on that basis alleges that nVision also misappropriated

4    this trade secret through improper disclosure when, for example, it consulted with various

5    physicians about the design, development, or clinical trials for the Mako device.  As a result, Ms.

6    Sarna's actions to acquire patents on this trade secret and assign them to nVision, to develop and

7    market the Mako device that implements this trade secret, and disclose the trade secret to

8    practitioners as part of the design and development of the Mako product, all constitute

9    misappropriation of this trade secret.

10           g.      nVision directly and indirectly misappropriated this trade secret.  For example,

11   nVision obtained this trade secret from Ms. Sarna and were conscious wrongdoers because they

12   acted with the knowledge or despite the known risk that the information it obtained from Ms.

13   Sarna was a trade secret acquired through improper means.  nVision knew Ms. Sarna was an

14   employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for

15   patents on catheter systems and assigned them while still employed at BioCardia.  Another

16   example of nVision's misappropriation of this trade secret was the improper use and disclosure of

17   this trade secret through the design, development, and documentation of a new version of the

18   Mako, a device called Cytuity.  Cytuity implements imaging capability at the distal end of the

19   catheter in the manner described in this trade secret.  Furthermore, documentation on Cytuity also

20   misappropriated this trade secret through the improper disclosure of the secret.  *See, e.g.*, "Cytuity

21   Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-

22   US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing

23   BioCardia trade secrets by implementing imaging capability in a manner described in this trade

24   secret).  BioCardia Lifesciences is informed and believes and on that basis alleges that nVision

25   misappropriated this trade secret through improper disclosure when, for example, it consulted

26   with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for

27   the Cytuity device.

28           h.      nVision's misappropriation damaged BioCardia Lifesciences.  For example,

-73-

1   because of Ms. Sarna's misappropriation, the BioCardia Entities missed out on the $275 million

2   valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

3   commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

4   on the method, along with the financial benefits that monopoly would confer.

5       172.   **Diagnostic method of inserting a catheter with imaging capability, such as**

6   **cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for**

7   **example, advancing a guide catheter into the uterus to gain access to the ostium of a**

8   **fallopian tube, advancing a second catheter system through the guide catheter with imaging**

9   **capabilities to enable navigation and sampling for biologic analysis**:

10      a.   This diagnostic method is a trade secret because it is a method, technique, or

11  process, that derives actual or potential economic value from not being known and is subject to

12  reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

13  catheter, which can equally be called a technique or process.

14      b.   This trade secret derived both actual and potential value from not being generally

15  known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

16  which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

17  early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

18  Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision

19  based in part on its commercial development of this trade secret.

20      c.   BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

21  The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

22  notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

23  notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

24  of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

25  Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

26  BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

27  Furthermore, BioCardia internal documents containing confidential information were labelled

28  "confidential" and all documents containing BioCardia confidential information that were

-74-

1    distributed externally were marked "confidential."  For example, BioCardia employees received,

2    and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document

3    Control" to preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the

4    facilities and were escorted by a company employee at all times.  BioCardia has never had more

5    than approximately twenty employees and an appropriately sized facility, so the presence of an

6    unauthorized person would be recognized.

7            d.      BioCardia Lifesciences is the owner of this trade secret because the two

8    individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

9    Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

10   predecessor Hippocratic Engineering.

11           e.      Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

12   explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

13   excerpts are examples of disclosures from the notebook that describe this trade secret:

     

14

15

16

17

18

19           f.      Ms. Sarna and nVision directly misappropriated this trade secret by disclosing and

20   using the trade secret through improper means.  For example, Section 2 of Ms. Sarna's

21   employment agreement with BioCardia required her to hold confidential information in the

22   strictest confidence and not to use the information except for the benefit of BioCardia.  For

23   example, claim 1 of PCT/US Patent Application No. 2012/022,619 sets out all the components of

24   this trade secret.  Ms. Sarna's efforts to develop and commercialize the Mako also

25   misappropriated this trade secret, since implementation of the Mako device utilizes imaging

26   capability at the distal end of the catheter as described in this trade secret.  Mako documentation,

27   such as the instructions for use, also disclose this trade secret since the documents describe using

28

-75-

1    a catheter with imaging capability at the distal end of the catheter in a manner described in this

2    trade secret.  BioCardia Lifesciences is informed and believes and on that basis alleges that

3    nVision also misappropriated this trade secret through improper disclosure when, for example, it

4    consulted with various physicians about the design, development, or clinical trials for the Mako

5    device.   As a result, Ms. Sarna's actions to acquire patents on this trade secret and assign them to

6    nVision, to develop and market the Mako device that implements this trade secret, and disclose

7    the trade secret to practitioners as part of the design and development of the Mako product, all

8    constitute misappropriation of this trade secret.

9          g.      nVision directly and indirectly misappropriated this trade secret.  For example,

10   nVision obtained this trade secret from Ms. Sarna, and was a conscious wrongdoer because it

11   acted with the knowledge or despite the known risk that the information it obtained from Ms.

12   Sarna was a trade secret acquired through improper means.  nVision knew Ms. Sarna was an

13   employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for

14   patents on catheter systems and assigned them to nVision while still employed at BioCardia.

15   Another example of nVision's misappropriation of this trade secret was the improper use and

16   disclosure of this trade secret through the design, development, and documentation of a new

17   version of Mako, a device called Cytuity.  Cytuity implements imaging capability at the distal end

18   of the catheter in the manner described in this trade secret.  Furthermore, documentation

19   developed for Cytuity also misappropriated this trade secret through the improper disclosure of

20   the secret.  *See, e.g.*, "Cytuity Directions For Use" Video available at

21   https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-

22   collection-catheter/demo-video.html (disclosing BioCardia trade secrets by implementing

23   imaging capability in a manner described in this trade secret).  BioCardia Lifesciences is

24   informed and believes and on that basis alleges that nVision misappropriated this trade secret

25   through improper disclosure when, for example, it consulted with various physicians about the

26   design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

27          h.      nVision's misappropriation damaged BioCardia Lifesciences.  For example,

28   because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

-76-

1   valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

2   commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

3   on the method, along with the financial benefits that monopoly would confer.

4   　　　　173.   **Diagnostic method of inserting a catheter with imaging capability, such as**

5   **cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for**

6   **example, advancing a guide catheter into the uterus to gain access to the ostium of a**

7   **fallopian tube, advancing a second catheter system through the guide catheter, using the**

8   **imaging capabilities to enable navigation and imaging of ovarian cysts or tumors**:

9   　　　　a.   This diagnostic method is a trade secret because it is a method, technique, or

10  process, that derives actual or potential economic value from not being known and is subject to

11  reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

12  catheter, which can equally be called a technique or process.

13  　　　　b.   This trade secret derived both actual and potential value from not being generally

14  known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

15  which the BioCardia Entities first reviewed in 2019, the addressable market for a non-invasive

16  method for early detection of ovarian cancer was $4 billion and involved roughly 8 million

17  patients per year.  Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to

18  purchase nVision based in part on its commercial development of this trade secret.

19  　　　　c.   BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

20  The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

21  notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

22  notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

23  of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

24  Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

25  BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

26  Furthermore, BioCardia internal documents containing confidential information were labelled

27  "confidential" and all documents containing BioCardia confidential information that were

28  distributed externally were marked "confidential."  For example, BioCardia employees received,

1  and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document

2  Control" to preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the

3  facilities and were escorted by a company employee at all times.  BioCardia has never had more

4  than approximately twenty employees and an appropriately sized facility, so the presence of an

5  unauthorized person would be recognized.

6       d.      BioCardia Lifesciences  is the owner of this trade secret because the two

7  individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

8  Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

9  predecessor Hippocratic Engineering.

10      e.      Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

11 explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

12 excerpts are examples of disclosures from the notebook that describe this trade secret:

 

19      f.      Ms. Sarna and nVision directly misappropriated this trade secret by disclosing and

20 using the trade secret through improper means.  For example, Section 2 of Ms. Sarna's

21 employment agreement with BioCardia required her to hold confidential information in the

22 strictest confidence and not to use the information except for the benefit of BioCardia.  For

23 example, claim 1 of PCT/US Patent Application No. 2012/022,619 sets out all the components of

24 this trade secret.  nVision's efforts to develop and commercialize the Mako also misappropriated

25 this trade secret, since implementation of the Mako device utilizes imaging capability at the distal

26 end of the catheter as described in this trade secret.  Mako documentation, such as the instructions

27 for use, also disclose this trade secret since the documents describe using a catheter with imaging

28 capability at the distal end of the catheter in a manner described in this trade secret.  BioCardia

-78-

1    Lifesciences is informed and believes and on that basis alleges that nVision also misappropriated

2    this trade secret through improper disclosure when, for example, it consulted with various

3    physicians about the design, development, or clinical trials for the Mako device.  As a result, Ms.

4    Sarna's actions to acquire patents on this trade secret and assign them to nVision, to develop and

5    market the Mako device that implements this trade secret, and disclose the trade secret to

6    practitioners as part of the design and development of the Mako product, all constitute

7    misappropriation of this trade secret.

8         g.       nVision directly and indirectly misappropriated this trade secret.  For example,

9    nVision obtained this trade secret from Ms. Sarna and were conscious wrongdoers because they

10   acted with the knowledge or despite the known risk that the information it obtained from Ms.

11   Sarna was a trade secret acquired through improper means.  nVision knew Ms. Sarna was an

12   employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for

13   patents on catheter systems and assigned them to nVision while still employed at BioCardia.

14   Another example of nVision's misappropriation of this trade secret was the improper use and

15   disclosure of this trade secret through the design, development, and documentation of a new

16   version of the Mako, a device called Cytuity.  Cytuity implements imaging capability at the distal

17   end of the catheter in the manner described in this trade secret.  Furthermore, documentation

18   developed for Cytuity also misappropriated this trade secret through the improper disclosure of

19   the secret.  *See, e.g.*, "Cytuity Directions For Use" Video available at

20   https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-

21   collection-catheter/demo-video.html (disclosing BioCardia trade secrets by implementing

22   imaging capability in a manner described in this trade secret).  BioCardia Lifesciences is

23   informed and believes and on that basis alleges that nVision through improper disclosure when,

24   for example, it consulted with various physicians about the design, development, or clinical trials

25   (e.g., the nCYT trials) for the Cytuity device.

26        h.       nVision's misappropriation damaged BioCardia Lifesciences.  For example,

27   because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

28   valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

-79-

1    commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

2    on the method, along with the financial benefits that monopoly would confer.

3         174.    **Diagnostic method of inserting a catheter with imaging capability, such as**

4    **cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube, by, for**

5    **example, advancing a guide catheter into the uterus to gain access to the ostium of a**

6    **fallopian tube, advancing a second catheter system through the guide catheter, using the**

7    **imaging capability to enable navigation and imaging of ovarian cysts or tumors**:

8         a.    This diagnostic method is a trade secret because it is a method, technique, or

9    process, that derives actual or potential economic value from not being known and is subject to

10   reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

11   catheter, which can equally be called a technique or process.

12        b.    This trade secret derived both actual and potential value from not being generally

13   known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

14   which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

15   early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

16   Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision

17   based in part on its commercial development of this trade secret.

18        c.    BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

19   The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

20   notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

21   notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

22   of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

23   Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

24   BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

25   Furthermore, BioCardia internal documents containing confidential information were labelled

26   "confidential" and all documents containing BioCardia confidential information that were

27   distributed externally were marked "confidential."  For example, BioCardia employees received,

28   and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document

-80-

1   Control" to preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the

2   facilities and were escorted by a company employee at all times.  BioCardia has never had more

3   than approximately twenty employees and an appropriately sized facility, so the presence of an

4   unauthorized person would be recognized.

5          d.      BioCardia Lifesciences is the owner of this trade secret because the two

6   individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

7   Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

8   predecessor Hippocratic Engineering.

9          e.      Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

10  explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

11  excerpts are examples of disclosures from the notebook that describe this trade secret:

 

18         f.      Ms. Sarna and nVision directly misappropriated this trade secret by disclosing and

19  using the trade secret through improper means.  For example, Section 2 of Ms. Sarna's

20  employment agreement with BioCardia required her to hold confidential information in the

21  strictest confidence and not to use the information except for the benefit of BioCardia.  For

22  example, claim 1 of PCT/US Patent Application No. 2012/022,619 sets out all the components of

23  this trade secret.  nVision's efforts to develop and commercialize the Mako also misappropriated

24  this trade secret, since implementation of the Mako device utilizes imaging capability at the distal

25  end of the catheter as described in this trade secret.  Mako documentation, such as the instructions

26  for use, also disclose this trade secret since the documents describe using a catheter with imaging

27  capability at the distal end of the catheter in a manner described in this trade secret.  BioCardia

28  Lifesciences is informed and believes and on that basis alleges that nVision also misappropriated

-81-

1   this trade secret through improper disclosure when, for example, it consulted with various

2   physicians about the design, development, or clinical trials for the Mako device.   As a result, Ms.

3   Sarna's actions to acquire patents on this trade secret and assign them to nVision, to develop and

4   market the Mako device that implements this trade secret, and disclose the trade secret to

5   practitioners as part of the design and development of the Mako product, all constitute

6   misappropriation of this trade secret.

7          g.      nVision directly and indirectly misappropriated this trade secret.  For example,

8   nVision obtained this trade secret from Ms. Sarna and were conscious wrongdoers because they

9   acted with the knowledge or despite the known risk that the information it obtained from Ms.

10  Sarna was a trade secret acquired through improper means.  nVision knew Ms. Sarna was an

11  employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for

12  patents on catheter systems and assigned them to nVision while still employed at BioCardia.

13  Another example of nVision's misappropriation of this trade secret was the improper use and

14  disclosure of this trade secret through the design, development, and documentation of a new

15  version of the Mako, a device called Cytuity.  Cytuity implements imaging capability at the distal

16  end of the catheter in the manner described in this trade secret.  Furthermore, documentation for

17  Cytuity also misappropriated this trade secret through the improper disclosure of the secret.  *See,*

18  *e.g.*, "Cytuity Directions For Use" Video available at

19  https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-

20  collection-catheter/demo-video.html (disclosing BioCardia trade secrets by implementing

21  imaging capability in a manner described in this trade secret).  BioCardia Lifesciences is

22  informed and believes and on that basis alleges that nVision misappropriated this trade secret

23  through improper disclosure when, for example, it consulted with various physicians about the

24  design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

25         h.      nVision's misappropriation damaged BioCardia Lifesciences.  For example,

26  because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

27  valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

28  commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

-82-

1    on the method, along with the financial benefits that monopoly would confer.

2        175.   **Diagnostic method of inserting a catheter imaging capability, such as**

3    **cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for**

4    **example, advancing a guide catheter into the uterus to gain access to the ostium of a**

5    **fallopian tube, advancing a second catheter system through the guide catheter with**

6    **ultrasound imaging, to enable navigation and imaging of an ovarian cyst or tumor, and to**

7    **take an action selected from the set of (1) characterizing said cyst or said tumor or (2)**

8    **planning therapeutic intervention of said cysts and said tumors**:

9        a.    This diagnostic method is a trade secret because it is a method, technique, or

10   process, that derives actual or potential economic value from not being known and is subject to

11   reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

12   catheter, which can equally be called a technique or process.

13       b.    This trade secret derived both actual and potential value from not being generally

14   known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

15   which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

16   early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

17   Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision

18   based in part on its commercial development of this trade secret.

19       c.    BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

20   The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

21   notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

22   notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

23   of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

24   Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

25   BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

26   Furthermore, BioCardia internal documents containing confidential information were labelled

27   "confidential" and all documents containing BioCardia confidential information that were

28   distributed externally were marked "confidential."  For example, BioCardia employees received,

-83-

1   and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document

2   Control" to preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the

3   facilities and were escorted by a company employee at all times.  BioCardia has never had more

4   than approximately twenty employees and an appropriately sized facility, so the presence of an

5   unauthorized person would be recognized.

6        d.     BioCardia Lifesciences is the owner of this trade secret because the two

7   individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

8   Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

9   predecessor Hippocratic Engineering.

10       e.     Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

11  explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

12  excerpts are examples of disclosures from the notebook that describe this trade secret:

13   

23       f.     nVision directly misappropriated this trade secret by disclosing and using the trade

24  secret through improper means.  nVision obtained this trade secret from Ms. Sarna and was a

25  conscious wrongdoer because it acted with the knowledge or despite the known risk that the

26  information it obtained from Ms. Sarna was a trade secret acquired through improper means.  For

27  example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret.

28

nVision's efforts to develop and commercialize the Mako also misappropriated this trade secret, since, for example, implementation of the Mako device means using imaging capability to sample tissue in the fallopian tube to characterize the ovarian state. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of cells in the fallopian tube to determine ovarian state. BioCardia Lifesciences is informed and believes and on that basis alleges that nVision also misappropriated this trade secret through improper disclosure when, for example, it consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, nVision's development and marketing of the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g.      nVision directly and indirectly misappropriated this trade secret. nVision obtained this trade secret from Ms. Sarna and was a conscious wrongdoer because it acted with the knowledge or despite the known risk that the information it obtained from Ms. Sarna was a trade secret acquired through improper means. nVision knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems and assigned them to nVision while still employed at BioCardia. Another example of nVision's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of a new version of the Mako, a device called Cytuity. When Cytuity uses imaging capability to help collect a sample from the fallopian tube to determine ovarian state, it practices this trade secret. Furthermore, documentation developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing Cytuity using imaging capabilities to navigate a fallopian tube to collect a sample to determine ovarian state). BioCardia Lifesciences is informed and believes and on that basis alleges that nVision misappropriated this trade secret through improper disclosure when, for example, it consulted

-85-

1  with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for

2  the Cytuity device.

3        h.      nVision's misappropriation damaged BioCardia Lifesciences.  For example,

4  because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

5  valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

6  commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

7  on the method, along with the financial benefits that monopoly would confer.

8        176.   **Diagnostic method of inserting a catheter imaging capability, such as**

9  **cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for**

10  **example, advancing a guide catheter into the uterus to gain access to the ostium of a**

11  **fallopian tube, advancing a second catheter system through the guide catheter with imaging**

12  **capability to enable navigation and imaging of ovarian cysts or tumors and to take an action**

13  **selected from the set of (1) characterizing said cyst or said tumor or (2) planning**

14  **therapeutic intervention of said cysts and said tumors**:

15        a.      This diagnostic method is a trade secret because it is a method, technique, or

16  process, that derives actual or potential economic value from not being known and is subject to

17  reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

18  catheter, which can equally be called a technique or process.

19        b.      This trade secret derived both actual and potential value from not being generally

20  known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

21  which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

22  early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

23  Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision

24  based in part on its commercial development of this trade secret.

25        c.      BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

26  The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

27  notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

28  notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

-86-

1    of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

2    Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

3    BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

4    Furthermore, BioCardia internal documents containing confidential information were labelled

5    "confidential" and all documents containing BioCardia confidential information that were

6    distributed externally were marked "confidential."  For example, BioCardia employees received,

7    and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document

8    Control" to preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the

9    facilities and were escorted by a company employee at all times.  BioCardia has never had more

10   than approximately twenty employees and an appropriately sized facility, so the presence of an

11   unauthorized person would be recognized.

12       d.      BioCardia Lifesciences is the owner of this trade secret because the two

13   individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

14   Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

15   predecessor Hippocratic Engineering.

16       e.      Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

17   explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

18   excerpts are examples of disclosures from the notebook that describe this trade secret:

19

20

21

22

23

24

25

26

27

28

1

2




3

4

5

6

7

8

9

10

11    f.    nVision directly misappropriated this trade secret by disclosing and using the trade

12   secret through improper means. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all

13   the components of this trade secret.  nVision's efforts to develop and commercialize the Mako

14   also misappropriated this trade secret, since, for example, implementation of the Mako device

15   means using imaging capability to sample tissue in the fallopian tube to characterize the ovarian

16   state.  Mako documentation, such as the instructions for use, also disclose this trade secret since

17   the documents describe using a catheter to collect a sample of cells in the fallopian tube to

18   determine ovarian state.  BioCardia Lifesciences is informed and believes and on that basis

19   alleges that nVision also misappropriated this trade secret through improper disclosure when, for

20   example, it consulted with various physicians about the design, development, or clinical trials for

21   the Mako device.   As a result,  nVision's development and marketing of the Mako device that

22   implements this trade secret, and disclose the trade secret to practitioners as part of the design and

23   development of the Mako product, all constitute misappropriation of this trade secret.

24    g.    nVision directly and indirectly misappropriated this trade secret by, for example,

25   through the design, development, and documentation of a new version of the Mako, a device

26   called Cytuity.  When Cytuity uses imaging capability to help collect a sample from the fallopian

27   tube to determine ovarian state, it practices this trade secret.  Furthermore, documentation

28

developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret.  *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing Cytuity using imaging capabilities to navigate a fallopian tube to collect a sample to determine ovarian state).  BioCardia Lifesciences is informed and believes and on that basis alleges that nVision misappropriated this trade secret through improper disclosure when, for example, it consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

   h.  nVision's misappropriation damaged BioCardia Lifesciences.  For example, because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's commercialization of this trade secret prevented the BioCardia Entities from having a monopoly on the method, along with the financial benefits that monopoly would confer.

   177. **<u>Diagnostic method and devices for advancing a tissue-sampling element to the fallopian tube, fimbria, or ovary to take a solid or fluid tissue sample, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system having a tissue-sampling element through the guide catheter and advancing the tissue-sampling element to obtain a liquid or solid sample for biologic analysis</u>**:

   a.  This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

   b.  This trade secret derived both actual and potential value from not being generally known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

-89-

1    Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision

2    based in part on its commercial development of this trade secret.

3              c.        BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

4    The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

5    notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

6    notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

7    of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

8    Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

9    BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

10   Furthermore, BioCardia internal documents containing confidential information were labelled

11   "confidential" and all documents containing BioCardia confidential information that was released

12   externally were marked "confidential."  For example, BioCardia employees received, and

13   BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to

14   preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the facilities and

15   were escorted by a company employee at all times.  BioCardia has only ever had approximately

16   twenty employees and an appropriately sized facility, so the presence of an unauthorized person

17   would be recognized.

18             d.        BioCardia Lifesciences is the owner of this trade secret because the two

19   individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

20   Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

21   predecessor Hippocratic Engineering.

22             e.        Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

23   explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

24   excerpts are examples of disclosures from the notebook that describe this trade secret:

25

26

27

28

BIOCARDIA LIFESCIENCES, INC. COMPLAINT

1

 

2

3

4

5

6

7

8

9

10

        f.      nVision directly misappropriated this trade secret by disclosing this trade secret in

11

claim 1 of U.S. Patent No. 10,639,016, which  sets out all the components of this trade secret.

12

nVision's efforts to develop and commercialize the Mako also misappropriated this trade secret,

13

since implementation of the Mako device, such that the everting balloon at the distal end of the

14

catheter is used to collect cells from the fallopian tube, practices this trade secret.  Mako

15

documentation, such as the instructions for use, also disclose this trade secret since the documents

16

describe using a catheter to collect a sample of potentially diseased cells in the fallopian tube.

17

BioCardia Lifesciences is informed and believes and on that basis alleges that, nVision also

18

misappropriated this trade secret through improper disclosure when, for example, its President,

19

Ms. Sarna, consulted with various physicians about the design, development, or clinical trials for

20

the Mako device.   As a result, nVision's actions to acquire patents on this trade secret, develop

21

and market the Mako device that implements this trade secret, and disclose the trade secret to

22

practitioners as part of the design and development of the Mako product, all constitute

23

misappropriation of this trade secret.

24

        h.      nVision's misappropriation damaged BioCardia Lifesciences.  For example,

25

because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

26

valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

27

commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

28

-91-

1  on the method, along with the financial benefits that monopoly would confer.

2        178.  **Diagnostic method and devices to be used for tissue-sampling from the**

3  **fallopian tube, fimbria, or ovary by taking a solid or fluid tissue sample, by, for example,**

4  **advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube,**

5  **advancing a second catheter system having a penetrating element through the guide**

6  **catheter and advancing the penetrating element consisting of a hollow helical needle into the**

7  **fallopian tube, fimbria, or ovary to obtain a liquid or solid sample for biologic analysis**:

8        a.  This diagnostic method is a trade secret because it is a method, technique, or

9  process, that derives actual or potential economic value from not being known, and is subject to

10  reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

11  catheter, which can equally be called a technique or process.

12        b.  This trade secret derived both actual and potential value from not being generally

13  known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

14  which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

15  early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

16  Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision

17  based in part on its commercial development of this trade secret.

18        c.  BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

19  The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

20  notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

21  notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

22  of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

23  Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

24  BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

25  Furthermore, BioCardia internal documents containing confidential information were labelled

26  "confidential" and all documents containing BioCardia confidential information that was released

27  externally were marked "confidential."  For example, BioCardia employees received, and

28  BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to

-92-

1   preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the facilities and

2   were escorted by a company employee at all times.  BioCardia has only ever had approximately

3   twenty employees and an appropriately sized facility, so the presence of an unauthorized person

4   would be recognized.

5           d.      BioCardia Lifesciences is the owner of this trade secret because the two

6   individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

7   Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

8   predecessor Hippocratic Engineering.

9           e.      Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

10  explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

11  excerpts are examples of disclosures from the notebook that describe this trade secret:

12
13
14   
15
16
17
18  
19
20
21
22
23

24          f.      nVision directly misappropriated this trade secret by disclosing and using the trade

25  secret through improper means.  For example, claim 1 of U.S. Patent No. 10,639,016 sets out all

26  the components of this trade secret.  nVision's efforts to develop and commercialize the Mako

27  also misappropriated this trade secret, since implementation of the Mako device, such that the

28

-93-

1    everting balloon at the distal end of the catheter is used to collect cells from the fallopian tube,

2    practices this trade secret.  Mako documentation, such as the instructions for use, also disclose

3    this trade secret since the documents describe using a catheter to collect a sample of potentially

4    diseased cells in the fallopian tube.  BioCardia Lifesciences is informed and believes and on that

5    basis alleges that nVision also misappropriated this trade secret through improper disclosure

6    when, for example, nVision consulted with various physicians about the design, development, or

7    clinical trials for the Mako device.   As a result, nVision's actions to acquire patents on this trade

8    secret, develop and market the Mako device that implements this trade secret, and disclose the

9    trade secret to practitioners as part of the design and development of the Mako product, all

10   constitute misappropriation of this trade secret.

11        h.        nVision's misappropriation damaged BioCardia Lifesciences.  For example,

12   because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

13   valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

14   commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

15   on the method, along with the financial benefits that monopoly would confer.

16        179.   **Diagnostic method and devices to be used for tissue-sampling from the**

17   **fallopian tube, fimbria, or ovary by taking a solid or fluid tissue sample, by, for example,**

18   **advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube,**

19   **advancing a second catheter system having a tissue-sampling element through the guide**

20   **catheter and advancing the tissue-sampling element into the fallopian tube, fimbria, or**

21   **ovary to obtain a liquid or solid sample for biologic analysis**:

22        a.        This diagnostic method is a trade secret because it is a method, technique, or

23   process, that derives actual or potential economic value from not being known, and is subject to

24   reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

25   catheter, which can equally be called a technique or process.

26        b.        This trade secret derived both actual and potential value from not being generally

27   known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

28   which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

-94-

1    early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

2    Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision

3    based in part on its commercial development of this trade secret.

4           c.      BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

5    The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

6    notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the

7    notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

8    of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

9    Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with

10   BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

11   Furthermore, BioCardia internal documents containing confidential information were labelled

12   "confidential" and all documents containing BioCardia confidential information that was released

13   externally were marked "confidential." For example, BioCardia employees received, and

14   BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to

15   preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and

16   were escorted by a company employee at all times. BioCardia has only ever had approximately

17   twenty employees and an appropriately sized facility, so the presence of an unauthorized person

18   would be recognized.

19          d.      BioCardia Lifesciences is the owner of this trade secret because the two

20   individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

21   Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

22   predecessor Hippocratic Engineering.

23          e.      Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

24   explained a March 2000 lab notebook entry to her during an hour-long meeting. The following

25   excerpts are examples of disclosures from the notebook that describe this trade secret:

26

27

28

1
2
3
4
5
6
7




8
9
10
11
12
13



f.      nVision misappropriated this trade secret by disclosing and using the trade secret through improper means.  For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret.  nVision's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that the everting balloon at the distal end of the catheter is used to collect cells from the fallopian tube, practices this trade secret.  Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of potentially diseased cells in the fallopian tube.  BioCardia Lifesciences is informed and believes and on that basis alleges that nVision also misappropriated this trade secret through improper disclosure when, for example, nVision consulted with various physicians about the design, development, or clinical trials for the Mako device.   As a result, nVision's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g.      nVision's misappropriation damaged BioCardia Lifesciences.  For example,

-96-

1   because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

2   valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

3   commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

4   on the method, along with the financial benefits that monopoly would confer.

5        180.   **Therapeutic method of inserting a catheter with imaging capability, such as**

6   **cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube to**

7   **advance a therapy, by, for example, advancing a guide catheter into the uterus to gain access**

8   **to the ostium of a fallopian tube, advancing a second catheter system through the guide**

9   **catheter with imaging capability, to enable navigation and imaging of an ovarian cyst or**

10  **tumor, and to take an action selected from the set of (1) ablating regions of the ovary, (2)**

11  **delivering controlled release drug delivery matrices to relevant tissue in and around the**

12  **ovary, or (3) draining the tissue mass penetrated by the hollow penetrating element**:

13      a.   This therapeutic method is a trade secret because it is a method, technique, or

14  process, that derives actual or potential economic value from not being known, and is subject to

15  reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

16  catheter, which can equally be called a technique or process.

17      b.   This trade secret derived both actual and potential value from not being generally

18  known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

19  which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

20  early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

21  Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision

22  based in part on its commercial development of this trade secret.

23      c.   BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

24  The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

25  notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

26  notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

27  of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

28  Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

-97-

1  BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

2  Furthermore, BioCardia internal documents containing confidential information were labelled

3  "confidential" and all documents containing BioCardia confidential information that was released

4  externally were marked "confidential."  For example, BioCardia employees received, and

5  BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to

6  preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the facilities and

7  were escorted by a company employee at all times.  BioCardia has only ever had approximately

8  twenty employees and an appropriately sized facility, so the presence of an unauthorized person

9  would be recognized.

10        d.       BioCardia Lifesciences is the owner of this trade secret because the two

11  individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

12  Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

13  predecessor Hippocratic Engineering.

14        e.       Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

15  explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

16  excerpts are examples of disclosures from the notebook that describe this trade secret:

17

18

19

20

21

22

23

24

25

26

27

28

-98-





A fluid biopsy probe, such as a hollow helical needle may be rotated into the ovary to obtain a sample of the cyst. Such a probe could also be used to drain the cyst. Such a probe could also be used to deliver RF energy to kill tissue in the cyst, or to deliver alcohol or cytotoxic agents designed to introduce necrosis locally.

The steerable guide gains access through the vagina to the fallopian tube and may be facilitated by fiber optic imaging.

Guide tube Distal END

CAMARA
GUIDE LUMEN

The steerable guide once position may be used to advance imaging probes such as rotating ultrason transducers, biopsy probes, therapeutic probes, or combinations of these.

    f.      nVision directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret. nVision's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that the everting balloon at the distal end of the catheter is used to collect cells from the fallopian tube, practices this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of potentially diseased cells in the fallopian tube. BioCardia Lifesciences is informed and believes and on that basis alleges that nVision also misappropriated this trade secret through improper disclosure when, for example, it consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, nVision's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the

1  trade secret to practitioners as part of the design and development of the Mako product, all

2  constitute misappropriation of this trade secret.

3       h.     nVision's misappropriation damaged BioCardia Lifesciences.  For example,

4  because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

5  valuation Boston Scientific placed on the intellectual property.  Furthermore, Ms. Sarna's and

6  Boston Scientific's commercialization of this trade secret prevented the BioCardia Entities from

7  having a monopoly on the method, along with the financial benefits that monopoly would confer.

8       181.   **Therapeutic method of inserting a catheter with imaging, such as cameras,**

9  **fiber optics, or ultrasound imaging, on its distal end into a fallopian tube to advance a**

10  **therapy, by, for example, advancing a guide catheter into the uterus to gain access to the**

11  **ostium of a fallopian tube, advancing a second catheter system through the guide catheter**

12  **with ultrasound imaging, to enable navigation and imaging of an ovarian cyst or tumor, and**

13  **to take an action selected from the set of (1) ablating regions of the ovary using**

14  **radiofrequency energy or (2) ablating the regions of the ovary by the delivery of alcohol**:

15       a.     This therapeutic method is a trade secret because it is a method, technique, or

16  process, that derives actual or potential economic value from not being known, and is subject to

17  reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

18  catheter, which can equally be called a technique or process.

19       b.     This trade secret derived both actual and potential value from not being generally

20  known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

21  which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

22  early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

23  Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision

24  based in part on its commercial development of this trade secret.

25       c.     BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

26  The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

27  notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

28  notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

1   of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

2   Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

3   BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

4   Furthermore, BioCardia internal documents containing confidential information were labelled

5   "confidential" and all documents containing BioCardia confidential information that was released

6   externally were marked "confidential."  For example, BioCardia employees received, and

7   BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to

8   preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the facilities and

9   were escorted by a company employee at all times.  BioCardia has only ever had approximately

10  twenty employees and an appropriately sized facility, so the presence of an unauthorized person

11  would be recognized.

12          d.        BioCardia Lifesciences is the owner of this trade secret because the two

13  individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

14  Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

15  predecessor Hippocratic Engineering.

16          e.        Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

17  explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

18  excerpts are examples of disclosures from the notebook that describe this trade secret:

19

20

21

22

23

24

25

26

27

28

BIOCARDIA LIFESCIENCES, INC. COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15




16       f.     nVision directly misappropriated this trade secret by disclosing and using the trade

17 secret through improper means.  For example, claim 1 of PCT/US Patent Application No.

18 2012/022,619 sets out all the components of this trade secret.  nVision's efforts to develop and

19 commercialize the Mako also misappropriated this trade secret, since implementation of the Mako

20 device utilizes imaging capability at the distal end of the catheter as described in this trade secret.

21 Mako documentation, such as the instructions for use, also disclose this trade secret since the

22 documents describe using a catheter with imaging capability at the distal end of the catheter in a

23 manner described in this trade secret.  BioCardia Lifesciences is informed and believes and on

24 that basis alleges that nVision also misappropriated this trade secret through improper disclosure

25 when, for example, nVision consulted with various physicians about the design, development, or

26 clinical trials for the Mako device.   As a result, nVision's actions to acquire patents on this trade

27 secret, develop and market the Mako device that implements this trade secret, and disclose the

28 trade secret to practitioners as part of the design and development of the Mako product, all

1  constitute misappropriation of this trade secret.

2       h.     nVision's misappropriation damaged BioCardia Lifesciences.  For example,

3  because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

4  valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

5  commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

6  on the method, along with the financial benefits that monopoly would confer.

7       182.    **Therapeutic method and devices to be used through the vagina, uterus, and**

8  **fallopian tube to advance a hollow element from a catheter to assist with tissue sampling,**

9  **where, for example, the hollow element is connected to a fluid conduit within the catheter**

10  **system that is connected to a reservoir outside of the body**:

11       a.     This therapeutic method is a trade secret because it is a method, technique, or

12  process, that derives actual or potential economic value from not being known, and is subject to

13  reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

14  catheter, which can equally be called a technique or process.

15       b.     This trade secret derived both actual and potential value from not being generally

16  known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

17  which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

18  early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

19  Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision

20  based in part on its commercial development of this trade secret.

21       c.     BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

22  The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

23  notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

24  notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

25  of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

26  Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

27  BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

28  Furthermore, BioCardia internal documents containing confidential information were labelled

-103-

1   "confidential" and all documents containing BioCardia confidential information that was released

2   externally were marked "confidential."  For example, BioCardia employees received, and

3   BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to

4   preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the facilities and

5   were escorted by a company employee at all times.  BioCardia has only ever had approximately

6   twenty employees and an appropriately sized facility, so the presence of an unauthorized person

7   would be recognized.

8          d.      BioCardia Lifesciences is the owner of this trade secret because the two

9   individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

10  Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

11  predecessor Hippocratic Engineering.

12         e.      Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

13  explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

14  excerpts are examples of disclosures from the notebook that describe this trade secret:



f.      nVision directly misappropriated this trade secret by disclosing and using the trade secret through improper means.  For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret.  nVision's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that a fluid reservoir supplies fluid through a hollow element to evert a balloon at the distal end of the catheter to collect cells from the fallopian tube, practices this trade secret.  Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a fluid reservoir supplies fluid through a hollow element to evert a balloon at the distal end of the catheter to collect cells from the fallopian tube.  BioCardia Lifesciences is informed and believes and on that basis alleges that nVision also misappropriated this trade secret through improper disclosure when, for example, nVision consulted with various physicians about the design, development, or clinical trials for the Mako device.   As a result, nVision's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

h.      nVision's misappropriation damaged BioCardia Lifesciences.  For example, because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's commercialization of this trade secret prevented the BioCardia Entities from having a monopoly on the method, along with the financial benefits that monopoly would confer.

183.   **Therapeutic strategy for identifying precancerous and cancerous growths based on a diagnosis performed from a locally-obtained sample before evidence of metastasis has appeared by, for example, obtaining a local biological sample derived from the ovary or adjacent fluids to determine that the ovary has a significant possibility of having a malignant cancer, and using this information to determine appropriate treatments**:

a.      This therapeutic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

1  catheter, which can equally be called a technique or process.

2      b.      This trade secret derived both actual and potential value from not being generally

3  known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

4  which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

5  early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

6  Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision

7  based in part on its commercial development of this trade secret.

8      c.      BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

9  The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

10  notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

11  notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

12  of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

13  Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

14  BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

15  Furthermore, BioCardia internal documents containing confidential information were labelled

16  "confidential" and all documents containing BioCardia confidential information that was released

17  externally were marked "confidential."  For example, BioCardia employees received, and

18  BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to

19  preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the facilities and

20  were escorted by a company employee at all times.  BioCardia has only ever had approximately

21  twenty employees and an appropriately sized facility, so the presence of an unauthorized person

22  would be recognized.

23      d.      BioCardia Lifesciences is the owner of this trade secret because the two

24  individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

25  Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

26  predecessor Hippocratic Engineering.

27      e.      Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

28  explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

-106-

excerpts are examples of disclosures from the notebook that describe this trade secret:

 

f.      nVision directly misappropriated this trade secret by disclosing and using the trade secret through improper means.  For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret.  nVision's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that the everting balloon at the distal end of the catheter is used to obtain a local biological sample derived from the ovary or adjacent fluids to determine that the ovary has a significant possibility of having a malignant cancer, practices this trade secret.  Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to obtain a local biological sample derived from the ovary or adjacent fluids to determine ovarian state.  BioCardia Lifesciences is informed and believes and on that basis alleges that nVision also misappropriated this trade secret through improper disclosure when, for example, nVision consulted with various physicians about the design, development, or clinical trials for the Mako device.  As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and

-107-

1   market the Mako device that implements this trade secret, and disclose the trade secret to

2   practitioners as part of the design and development of the Mako product, all constitute

3   misappropriation of this trade secret.

4        h.     nVision's misappropriation damaged BioCardia Lifesciences.  For example,

5   because of Ms. Sarna's misappropriation, the BioCardia Entities missed out on the $275 million

6   valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

7   commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

8   on the method, along with the financial benefits that monopoly would confer.

9        184.   **Therapeutic strategy for delivering ablative compounds such as alcohol or**

10   **ablative energy through a catheter system passed through a vagina, uterus, and fallopian**

11   **tubes to treat disease or a condition of the ovary in which a penetrating element is advanced**

12   **into the fallopian tubes, fimbria, or ovary**:

13        a.     This therapeutic method is a trade secret because it is a method, technique, or

14   process, that derives actual or potential economic value from not being known, and is subject to

15   reasonable efforts to maintain its secrecy.  As the trade secret suggests, it is a method of using a

16   catheter, which can equally be called a technique or process.

17        b.     This trade secret derived both actual and potential value from not being generally

18   known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision,

19   which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

20   early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.

21   Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision

22   based in part on its commercial development of this trade secret.

23        c.     BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

24   The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab

25   notebook.  Dr. Altman kept this lab notebook in a secure location in his office.  Access to the

26   notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

27   of this notebook entry related to this disclosure:  Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter

28   Altman, and Ms. Sarna.  Each of these people entered into a non-disclosure agreement with

1    BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

2    Furthermore, BioCardia internal documents containing confidential information were labelled

3    "confidential" and all documents containing BioCardia confidential information that was released

4    externally were marked "confidential."  For example, BioCardia employees received, and

5    BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to

6    preserve secrecy.  Finally, visitors to BioCardia had to sign-in to gain access to the facilities and

7    were escorted by a company employee at all times.  BioCardia has only ever had approximately

8    twenty employees and an appropriately sized facility, so the presence of an unauthorized person

9    would be recognized.

10           d.      BioCardia Lifesciences is the owner of this trade secret because the two

11   individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

12   Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

13   predecessor Hippocratic Engineering.

14           e.      Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

15   explained a March 2000 lab notebook entry to her during an hour-long meeting.  The following

16   excerpts are examples of disclosures from the notebook that describe this trade secret:

17

18

19

20

21

22

23

24

25

26

27

28



The handwritten notes read:

A fluid biopsy probe, such as a hollow helical needle may be rotated into the ovary to obtain a sample of the cyst. Such a probe could also be used to drain the cyst. Such a probe could also be used to deliver RF energy to kill tissue in the cyst, or to deliver alcohol or cytotoxic agents designed to introduce necrosis locally.

The steerable guide gains access through the vagina to the fallopian tube and may be facilitated by fiber optic imaging.

The steerable guide once position may be used to advance imaging probes such as rotating ultrasound transducers, biopsy probes, therapeutic probes, or combinations of these.

     f.      nVision directly misappropriated this trade secret by disclosing and using the trade secret through improper means.  For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret.  nVision's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that the everting balloon at the distal end of the catheter is used to collect cells from the fallopian tube, practices this trade secret.  Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of potentially diseased cells in the fallopian tube.  BioCardia Lifesciences is informed and believes and on that basis alleges that nVision also misappropriated this trade secret through improper disclosure when, for example, nVision consulted with various physicians about the design, development, or clinical trials for the Mako device.   As a result, nVision's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

-110-

h.      nVision's misappropriation damaged BioCardia Lifesciences.  For example, because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's commercialization of this trade secret prevented the BioCardia Entities from having a monopoly on the method, along with the financial benefits that monopoly would confer.

185.     **and cancerous cysts minimally invasively with details on the ramifications for therapy with early diagnosis, and strategies for doing so that align with new biological measurement technologies in gene expression and genetic analysis that enable a small sample to identify the presence of disease, including details on the players in the gene diagnosis space looking at blood (CareDx), solid tumor tissues (Genomic health), and cells sloughing from within a body lumen conduit such as that of a bowel movement which passes through the colon (EXACT Sciences)**:

a.      This market need is a trade secret because it is information that derives actual or potential economic value from not being known and is subject to reasonable efforts to maintain its secrecy.

b.      This trade secret derived both actual and potential value from not being generally known to the public.  For example, as Ms. Sarna set out in her 2013 presentation on nVision, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year.  Dkt 1 at Ex. B at slide 29.  In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c.      BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only people who were aware of this trade secret were Drs. Altman and Stertzer, and neither recorded this trade secret in the lab notebook or any other document.  As a result, the secret could not be made public unless Dr. Altman or Dr. Stertzer made the conscious decision to disclose it. Both Drs. Altman and Stertzer were contractually bound to keep this BioCardia trade secret confidential by non-disclosure agreements.

d.      BioCardia Lifesciences is the owner of this trade secret because the two

1    individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon

2    Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its

3    predecessor Hippocratic Engineering.

4         e.    Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and

5    explained a March 2000 lab notebook entry to her during an hour-long meeting.  Although this

6    particular trade secret was not recorded in the lab notebook, Dr. Altman had extensive knowledge

7    of the subject based on his involvement in CareDx, one of the leading gene expression profiling

8    companies in the world.  Dr. Altman shared this knowledge with Ms. Sarna during their meeting

9    in or around May 2009, in the hopes that it would motivate her to further develop the concepts

10   disclosed in the March 2000 lab notebook entry.

11        f.    nVision directly misappropriated this trade secret by disclosing and using the trade

12   secrets.  For example, claim 1 of PCT/US Patent Application No. 2018/000,229 sets out all the

13   components of this trade secret, by, for example covering "a device for Fallopian tube

14   diagnostics" using tissue samples from the fallopian tubes.  nVision's efforts to develop and

15   commercialize the Mako also misappropriated this trade secret, since implementation of the Mako

16   device required use of gene expression technology in order to determine ovarian state, thereby

17   practicing this trade secret.  Mako documentation, such as the instructions for use, also disclose

18   this trade secret.  BioCardia Lifesciences is informed and believes and on that basis alleges that

19   nVision also misappropriated this trade secret through improper disclosure when, for example,

20   nVision consulted with various physicians about the design, development, or clinical trials for the

21   Mako device.   As a result, nVision's actions to acquire patents on this trade secret, develop and

22   market the Mako device that implements this trade secret, and disclose the trade secret to

23   practitioners as part of the design and development of the Mako product, all constitute

24   misappropriation of this trade secret.

25        h.    nVision's misappropriation damaged BioCardia Lifesciences.  For example,

26   because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

27   valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

28   commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

-112-

on the method, along with the financial benefits that monopoly would confer.

**Trade Secrets Disclosed by BioCardia Testing Equipment**

186.    **A catheter system which includes a distal spring element on its end and having a round spherical ball mounted on the spring to avoid damage to the lumen through which it is passed, by, for example, having of a catheter shaft with a hollow lumen, containing a fluid conduit, which passes through a helical metal spring on its distal end attached to a small ball attached to the distal most end**:

a.    This ball-and-spring structure is a trade secret because it is a device that derives actual or potential economic value from not being known and is subject to reasonable efforts to maintain its secrecy.

b.    This trade secret derived both actual and potential value from not being generally known to the public.  It presents a novel way of preventing the tip of a catheter from damaging tissue as it is advanced in a body.  This presents a competitive advantage to BioCardia in that it has a useful safety feature that other catheter companies do not have.

c.    BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The spring-and-ball structure was part of testing equipment that BioCardia developed and built internally and was never shown to anyone outside the company.  Even within the company, only a small subset of employees actually saw this testing equipment.  Everyone who came into contact with the testing equipment was under a non-disclosure agreement.

d.    BioCardia Lifesciences the owner of this trade secret because the testing equipment was developed on behalf of BioCardia and the people who made the equipment assigned all rights, title, and interest to the equipment to BioCardia.

e.    The testing equipment was disclosed to Ms. Sarna as part of her work at BioCardia.  Ms. Sarna used this particular piece of equipment to ensure that catheters had the proper internal diameter to function properly.

f.    NVision misappropriated this trade secret by disclosing it in patent applications.

g.    nVision's misappropriation damaged BioCardia Lifesciences.  For example, because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

1    valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

2    commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

3    on the method, along with the financial benefits that monopoly would confer.

4

5    **Trade Secrets Disclosed by BioCardia Template Documents**

6        187.    **BioCardia template documents sent to Ms. Sarna's personal email account,**

7    **consisting of the following templates: Risk Analysis, Product Specification, Labelling**

8    **Verification, and Document Change Order procedures**:

9        a.    These template documents are trade secrets because they are information about

10    how to effectively handle medical device tasks, that derive actual or potential economic value

11    from not being known and are subject to reasonable efforts to maintain its secrecy.

12        b.    This trade secret derived both actual and potential value from not being generally

13    known to the public.  The knowledge and experience inherent in the documents, and the time and

14    resources saved from using the documents, confer a competitive advantage that makes medical

15    device development more profitable.  Because BioCardia's competitors do not have this

16    information, BioCardia has an advantage in the form of better products made at lower cost.

17        c.    BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret.

18    BioCardia internal documents containing confidential information were labelled "confidential"

19    and all documents containing BioCardia confidential information that were released externally

20    were marked "confidential."

21        d.    BioCardia is the owner of this trade secret because the individuals who created

22    these documents assigned all right, title, and interest in the intellectual property to BioCardia.

23        e.    These trade secrets were disclosed to Ms. Sarna when they were shared with her as

24    part of her work for BioCardia.

25        f.    BioCardia Lifesciences is informed and believes and on that basis alleges that

26    nVision incorporated the structure, format, and even language of the documents into nVision's

27    corresponding documents.

28        g.    nVision's misappropriation damaged BioCardia because it meant that nVision had

1   this valuable information to assist it in making competing catheter products.  In addition, these

2   template documents helped nVision's transition from a start-up to an established organization,

3   which meant they increased the competence of BioCardia's competition, and did so at a faster

4   rate than normally would happen.

5          h.      nVision's misappropriation damaged BioCardia Lifesciences.  For example,

6   because of nVision's misappropriation, the BioCardia Entities missed out on the $275 million

7   valuation Boston Scientific placed on the intellectual property.  Furthermore, nVision's

8   commercialization of this trade secret prevented the BioCardia Entities from having a monopoly

9   on the method, along with the financial benefits that monopoly would confer.

10          188.    The BioCardia trade secrets were subject to efforts that are reasonable under the

11  circumstances to maintain their secrecy, including but not limited to, requiring all employees to

12  execute the BioCardia standard Employment Agreement in the same form as the Sarna

13  Agreement attached hereto as **Exhibit A**, restricting access to BioCardia's information to

14  employees who have executed the BioCardia standard Employment Agreement, locking

15  BioCardia's facilities and restricting access to BioCardia's facilities to employees who had signed

16  the standard Employment Agreement and to visitors who are escorted by someone who had

17  signed the standard Employment Agreement.

18          189.    BioCardia Lifesciences is informed and believes and on that basis alleges that the

19  Shareholder Defendants and Boston Scientific are sophisticated companies and investors focused

20  on investments in or acquisitions of early-stage companies (each an "Investment Target") and,

21  thus, are familiar with intellectual property issues that Investment Targets have.  These include,

22  among other things, that a former employer of a founder of an Investment Target might have a

23  claim to ownership of the inventions claimed by the Investment Target, or that the inventions

24  claimed by the Investment Target may be based on trade secrets misappropriated from a former

25  employer because, among other things.

26          a.   They had been contractually assigned by the founder to the founder's former

27               employer;

28

-115-

b.   They were co-invented with an employee or employees of the founder's former employer; or

c.   They were based on information learned at and/or belonging to the former employer.

190.   BioCardia Lifesciences is informed and believes and on that basis alleges that because of, among other things, the intellectual property issues that an Investment Target might have with a founder's former employer, the Shareholder Defendants and Boston Scientific customarily perform "due diligence" on an  Investment Target focusing particularly on ferreting out any issues that might exist with the Investment Target's ownership or right to use its purported technology and intellectual property.

191.   BioCardia Lifesciences is informed and believes and on that basis alleges that the Shareholder Defendants and Boston Scientific focused on investments in and acquiring early-stage medical device companies and, therefore, knew, or at least should have known, that BioCardia, the company nVision's founder, Ms. Surbhi Sarna, worked for immediately prior to nVision, was also a medical device company working on the same type of medical device that nVision planned to work on:  diagnostic catheters.

192.   BioCardia Lifesciences is informed and believes and on that basis alleges that, as specialists in investments in or acquisitions of early stage medical device companies, the Shareholder Defendants and Boston Scientific knew or at least should have known there was a heightened risk – well beyond the risks inherent in any early stage company - that nVision's technology and intellectual property actually belonged to BioCardia.

193.   BioCardia Lifesciences is informed and believes and on that basis alleges that, in addition to the heightened risk inherent in the fact that nVision was focused on the same type of medical device development as was BioCardia (diagnostic catheters), the Shareholder Defendants and Boston Scientific knew that there was a likelihood that nVision's claimed technology and intellectual property actually belonged to or had been misappropriated from BioCardia, because they knew or at least should have known through their due diligence of nVision that:

a.   Ms. Sarna's undergraduate major was molecular and cellular biology.  She does not have any graduate degrees.  Her work at BioCardia dealt with tracking device

failures, ensuring label compliance, and obtaining materials from vendors.  While at BioCardia, Ms. Sarna's work responsibilities did not include designing or developing medical devices.  BioCardia Lifesciences is informed and believes and on that basis alleges that Ms. Sarna's only other experience in the medical device space involved similar tasks as the ones she performed at BioCardia.  Ms. Sarna's age, education, and work experience were highly unusual for someone who allegedly came up with a medical device and technique so revolutionary that a company like Boston Scientific would value it at hundreds of millions of dollars.

b.      Ms. Sarna started consulting with BioCardia on September 15, 2008 and became a full-time employee of BioCardia on November 3, 2008, at which time she signed the Sarna Agreement, and where she worked until resigning in January 2012;

c.      Ms. Sarna registered nVision as a Delaware corporation on September 28, 2009, the year after she joined BioCardia and more than two years before she left BioCardia and apparently ran it in "stealth mode" to conceal its existence from BioCardia;

d.      Ms. Sarna entered into a "Technology Transfer Agreement" "effective as of December 26, 2009 between Surbhi Sarna (the 'Founder'), and nVision Medical Corporation, a Delaware corporation" more than two years before she left BioCardia.

e.      In the Technology Transfer Agreement, Ms. Sarna assigned to nVision "All rights, title and interests in and to all intellectual property arising out of or related to the 'nVision Medical; business plan, including, without limitation, all ideas, designs, techniques, processes, formulas, trade secrets, inventions, discoveries, improvements, research or development and test results, specifications, data, know-how, business methods, marketing plans, other business plans, strategies, forecasts, unpublished financial information, budgets, projections, business prospects, copyrights and trademarks (inclusive of all goodwill relate thereto), and the following trademark, copyright, and patent applications and registrations."  The patent application identified in the Technology Transfer Agreement is a "USPTO provisional patent application filed on or around September 29, 2009."

-117-

f.      Ms. Sarna only registered nVision to do business in California on February 21, 2012, about a month after she left BioCardia, when, BioCardia Lifesciences is informed and believes and on that basis alleges, she believed it was no longer possible to conceal nVision's existence from BioCardia.

g.      BioCardia Lifesciences is informed and believes and on that basis alleges that the **_incorporation_** of nVision more than two years **_before_** Ms. Sarna left BioCardia, and the **_registration_** of nVision to do business in California only **_after_** she had left BioCardia, alone should have set off alarm bells in any competent due diligence conducted by or for anyone seeking to invest in nVision;

h.      Ms. Sarna, in common with most Silicon Valley employees, was contractually obligated to assign to BioCardia inventions she made while working at BioCardia (see **Exhibit A** attached hereto-the Sarna Agreement), subject only to her proving that they were excluded by Labor Code § 2870, which BioCardia Lifesciences is informed and believes and on that basis alleges that anyone seeking to invest in nVision would understand was unlikely given that both nVision and BioCardia were in the same general area of medical devices (diagnostic catheters);

i.      On January 25, 2011, while a BioCardia employee and a year before Ms. Sarna left BioCardia, Ms. Sarna filed U.S. Provisional application No. 61/435,945 ("the '945 provisional patent application");

j.      On December 3, 2010, while still a BioCardia employee and a year before Ms. Sarna left BioCardia, Ms. Sarna emailed Anula Jayasuriya, then affiliated with Defendant Astia Angels nVision LLC and later affiliated with Defendant EXXclaim Capital Partners I, L.P., and Linda Greub, then a partner at Defendant LMNVC, LLC, from her BioCardia account requesting help conceptualizing the invention of the '945 provisional patent application;

k.      Ms. Sarna subsequently filed three other published applications claiming priority to the '945 provisional patent application;

-118-

1          l.        On November 13, 2011, also while still a BioCardia employee, Ms. Sarna

2      filed a provisional application entitled "Device and method to confirm occlusion of

3      the fallopian tube"; and

4          m.        Ms. Sarna subsequently filed Application No, 14/357,875, which claimed

5      priority to the '120 provisional patent application.

6          194.    BioCardia Lifesciences is informed and believes and on that basis alleges that the

7      Shareholder Defendants and Boston Scientific knew, or at least should have known, that the filing

8      of all of these patent applications while Ms. Sarna was employed by BioCardia, but which were

9      assigned to nVision, meant that the patent applications likely had been contractually assigned to

10     BioCardia.

11         195.    BioCardia Lifesciences is informed and believes and on that basis alleges that the

12     Shareholder Defendants and Boston Scientific also knew, or at least should have known, that the

13     filing of all of these patent applications while Ms. Sarna was employed by BioCardia, but which

14     were assigned to nVision, meant that there likely were unnamed BioCardia co-inventors on some

15     or all of the patent applications.

16         196.    BioCardia Lifesciences is informed and believes and on that basis alleges that the

17     Shareholder Defendants and Boston Scientific also knew, or at least should have known, that the

18     filing of all of these patent applications while Ms. Sarna was employed by BioCardia, but which

19     were assigned to nVision, together with the other acts alleged above while Ms. Sarna was a

20     BioCardia employee, meant that nVision's purported technology and intellectual property likely

21     was based on misappropriated BioCardia trade secrets.

22         197.    The risks undertaken by an investor who knows or should know that the

23     technology and intellectual property claimed by an Investment Target likely belongs to a former

24     employer as is with the case with the patents Ms. Sarna was contractually obligated to assign to

25     BioCardia, or is likely based on trade secrets misappropriated from a former employer, is unlike

26     any common investment and market risk.  While common investment risks, if realized, might

27     operate to reduce the value of the Investment Target and, therefore, the value of the investor's

28     investment, an investor who knows or should know that the technology and intellectual property

-119-

1    claimed by an Investment Target is likely based on patents rightfully owned by another or trade

2    secrets misappropriated from another is exposed to the equitable rights of the rightful owner of

3    the technology and intellectual property, including, as alleged below, the risk of disgorgement of

4    all benefits of the investment.

5           198.    Here, the Shareholder Defendants' investment in nVision and Boston Scientific's

6    acquisition of the stock of nVision was made with the actual or imputed knowledge that the

7    technology and intellectual property claimed by Ms. Sarna and nVision was likely based on

8    patents belonging to and trade secrets misappropriated from BioCardia; accordingly, they did not

9    undertake a common investment risk but, rather, undertook the risk of disgorgement of all

10   benefits from their investment.

11          199.    The Shareholder Defendants' and Boston Scientific's liability to BioCardia is

12   direct, not vicarious, and does not require piercing nVision's corporate veil.

13          200.    BioCardia Lifesciences is informed and believes and on that basis alleges that the

14   Shareholder Defendants made a conscious decision to participate in and further the wrongful acts

15   of nVision and Ms. Sarna by investing in nVision and providing it with the funding necessary to

16   commit the acts as herein alleged.

17          201.    Alternatively, BioCardia Lifesciences is informed and believes and on that basis

18   alleges that the Shareholder Defendants and Boston Scientific  were conscious wrongdoers

19   because they acted with the knowledge or despite the known risk that nVision and Ms. Sarna had

20   acted in violation of BioCardia's rights.  Their investments in nVision were made "despite a

21   known risk that the conduct in question violate[d] the rights of [BioCardia]."  Under California

22   law and Sections 51(3)(b) and 3 comment e, of the Restatement (Third) of Restitution and Unjust

23   Enrichment, their decision to invest in nVision despite that known risk of liability – i.e.,  despite

24   that "known unknown" – renders them "conscious wrongdoers" and places upon them the risk of

25   liability by a disgorgement measure.

26          202.    BioCardia Lifesciences is informed and believes and on that basis alleges that the

27   Shareholder Defendants provided funding to nVision that was a substantial factor in enabling

28   nVision and Ms. Sarna to commit the acts as herein alleged, and that the Shareholder Defendants

-120-

1    knowingly benefited from the acts as herein alleged.

2    203.    The Shareholder Defendants and Boston Scientific are required to disgorge to

3    BioCardia the amount of their unjust enrichment as a result of the acts alleged, including at least

4    the amount Boston Scientific paid the Shareholder Defendants for their shares of stock in

5    nVision.

6    204.    BioCardia Lifesciences is informed and believes and on that basis alleges that

7    Fortis, as Stockholders' Representative, is holding in trust approximately ten percent (10%) of the

8    amount paid by Boston Scientific for the nVision stock of the Shareholder Defendants, among

9    other shareholders, resulting from their provision of funding to nVision that was a substantial

10   factor in enabling nVision and Ms. Sarna to commit the acts as herein alleged, and therefore

11   Fortis is required to disgorge to BioCardia the amount it holds in trust for the Shareholder

12   Defendants.  The Shareholder Defendants are required to direct Fortis to disgorge to BioCardia

13   any amounts received from Boston Scientific that Fortis is holding for the benefit of the

14   Shareholder Defendants as a result of the Shareholders Defendants' unjust enrichment as a result

15   of the acts alleged, including at least the amount Boston Scientific paid the Shareholder

16   Defendants for their shares of stock in nVision.

17   205.    As a further direct and proximate result of Ms. Sarna's breaches of the Sarna

18   Agreement, Defendants other than Boston Scientific have been unjustly enriched for example, in

19   an amount equal to at least what Boston Scientific paid for nVision.  Defendants have been enriched

20   by Ms. Sarna's breaches of contract, reaping benefits they would not otherwise have achieved in

21   the absence of the breaches.  Defendants received benefits in the form of intellectual property and

22   money based on Ms. Sarna's breaches of contract as alleged above.  Defendants' retention of the

23   benefits they received from Ms. Sarna's breaches of contract is unjust as Ms. Sarna was not

24   contractually permitted to share these benefits with anyone else.   As such, BioCardia is entitled to

25   disgorgement of all of Defendants' profits and consequential gains reaped from their unjust

26   enrichment.  As a proximate result of the acts herein alleged, BioCardia Lifesciences is entitled to

27   damages in an amount to be proven for nVision's misappropriation of BioCardia's trade secret

28   claim;

-121-

206.    As a proximate result of the acts herein alleged, BioCardia Lifesciences is entitled to exemplary damages in an amount of twice BioCardia Lifesciences' actual damages for Defendants' willful and malicious misappropriation of the BioCardia Trade Secrets.

207.    As a proximate result of the acts herein alleged, BioCardia Lifesciences is entitled to attorneys' fees for Defendants' willful and malicious misappropriation of the BioCardia Trade Secrets.

## COUNT IV

**(Misappropriation of Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836) (Against Ms. Sarna, nVision and Boston Scientific and Disgorgement Against All Defendants)**

208.    BioCardia realleges paragraphs 1-207, inclusive.

209.    The Defend Trade Secrets Act, 18 U.S.C. § 1836, applies because at least some of the acts of misappropriation, including at least the disclosure or use of the BioCardia Trade Secrets, occurred after the May 11, 2016 effective date of the Act.

210.    The Shareholder Defendants and Boston Scientific are required to disgorge to BioCardia the amount of their unjust enrichment as a result of the acts alleged, including at least the amount Boston Scientific paid the Shareholder Defendants for their shares of stock in nVision.

211.    BioCardia Lifesciences is informed and believes and on that basis alleges that Fortis, as Stockholders' Representative, is holding in trust approximately ten percent (10%) of the amount paid by Boston Scientific for the nVision stock of the Shareholder Defendants, among other shareholders, resulting from their provision of funding to nVision that was a substantial factor in enabling nVision and Ms. Sarna to commit the acts as herein alleged, and therefore Fortis is required to disgorge to BioCardia the amount it holds in trust for the Shareholder Defendants.  The Shareholder Defendants are required to direct Fortis to disgorge to BioCardia any amounts received from Boston Scientific that Fortis is holding for the benefit of the Shareholder Defendants as a result of the Shareholders Defendants' unjust enrichment as a result of the acts alleged, including at least the amount Boston Scientific paid the Shareholder

-122-

1    Defendants for their shares of stock in nVision.

2        212.   As a further direct and proximate result of Ms. Sarna's breaches of the Sarna

3    Agreement, Defendants other than Boston Scientific have been unjustly enriched for example, in

4    an amount equal to at least what Boston Scientific paid for nVision.  Defendants have been enriched

5    by Ms. Sarna's breaches of contract, reaping benefits they would not otherwise have achieved in

6    the absence of the breaches.  Defendants received benefits in the form of intellectual property and

7    money based on Ms. Sarna's breaches of contract as alleged above.  Defendants' retention of the

8    benefits they received from Ms. Sarna's breaches of contract is unjust as Ms. Sarna was not

9    contractually permitted to share these benefits with anyone else.   As such, BioCardia is entitled to

10   disgorgement of all of Defendants' profits and consequential gains reaped from their unjust

11   enrichment.  As a proximate result of the acts herein alleged, BioCardia Lifesciences is entitled to

12   damages in an amount to be proven for nVision's misappropriation of BioCardia's trade secret

13   claim;

14       213.   As a proximate result of the acts herein alleged, BioCardia Lifesciences is entitled

15   to exemplary damages in an amount of twice BioCardia Lifesciences' actual damages for

16   Defendants' willful and malicious misappropriation of the BioCardia Trade Secrets.

17       214.   As a proximate result of the acts herein alleged, BioCardia Lifesciences is entitled

18   to attorneys' fees for Defendants' willful and malicious misappropriation of the BioCardia Trade

19   Secrets.

20

21                              **PRAYER FOR RELIEF**

22       1.    An order correcting the inventorship of the '945 Provisional Application Family,

23   the '120 Provisional Application Family, the '472 Application Family and the Additional

24   Provisional Applications to name Dr. Peter Altman and Dr. Simon Stertzer as co-inventors.

25       2.    Damages in an amount to be proven on BioCardia's misappropriation of trade secret

26   claim;

27       3.    Exemplary damages against  in an amount of twice BioCardia's actual damages for

28   nVision's willful and malicious misappropriation of the BioCardia Trade Secrets;

                                  -123-

4.      Attorneys' fees for its willful and malicious misappropriation of BioCardia's trade secrets;

5.      An order imposing a constructive trust for the benefit of BioCardia, on nVision and Boston Scimed and compelling the assignment to BioCardia, of each of the patents and patent applications in the '945 Provisional Application Family, the '120 Provisional Application Family, the '472 Application Family and the Additional Provisional Applications;

6.      An order requiring the disgorgement to BioCardia by all Defendants other than Fortis of their unjust enrichment and all consequential gains reaped from their unjust enrichment;

7.      An order requiring the disgorgement to BioCardia by the Shareholder Defendants of the consideration Boston Scientific paid for their nVision stock and all consequential gains reaped from their unjust enrichment;

8.      An order requiring the Shareholder Defendants to direct to disgorge to BioCardia any consideration Boston Scientific paid for the Shareholder Defendants' nVision stock and held by Fortis , and all consequential gains resulting therefrom;

9.      Pre-judgment and post-judgment interest; and

10.      Such further and other relief as the Court may deem proper and just.


Dated: October 26, 2020                    By  /s/ Ian N. Feinberg
                                               Ian N. Feinberg

                                           Attorneys for Plaintiff BioCardia Lifescienses, Inc.

**DEMAND FOR JURY TRIAL**

BioCardia demands trial by jury on all claims and issues so triable.


Dated: October 26, 2020                    By  /s/ Ian N. Feinberg
                                               Ian N. Feinberg

                                           Attorneys for Plaintiff BioCardia Lifesciences, Inc.

BIOCARDIA LIFESCIENCES, INC. COMPLAINT